## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ABBY MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:20-cv-00596-MHC |
| | ) | |
| STEVE WRIGLEY, Chancellor for the | ) | |
| Board of Regents of the University System | ) | |
| of Georgia, in his official capacity, and | ) | |
| KYLE MARRERO, President of Georgia | ) | |
| Southern University, in his official capacity, | ) | |
| BONNIE OVERSTREET, Conference | ) | |
| Services Manager for Georgia Southern | ) | |
| University, in her individual capacity; | ) | |
| MICHEL BLITCH, Conference Services | ) | |
| Coordinator for Georgia Southern | ) | |
| University, in her individual capacity; | ) | |
| SANDRA LENSCH, Conference Services | ) | |
| Specialist for Georgia Southern University, | ) | |
| in her individual capacity. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION
## TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

In 2016, the State of Georgia enacted a law that prohibits the State from contracting with certain parties unless they agree to not engage in a "boycott of Israel" for the duration of the contract. 2016 Ga. Laws Act 378 (codified at

O.C.G.A. § 50-5-85).[1] This law, like similar ones in 27 other states, aligns Georgia with the United States' long-standing policy of opposing boycotts against, and promoting cooperation with, Israel. *See* O.C.G.A. § 50-5-85(a)(1)(A) (citing the federal Export Administration Act, which has banned foreign-led economic boycotts of Israel for over forty years). Under the law, all Georgia state agencies, including the Board of Regents of the University System of Georgia and Georgia Southern University, acting on behalf of the Board of Regents, are required to include in all contracts for products or services valued at $1,000 or more the contractor's certification that he or she will not engage in a boycott of Israel for the duration of the contract.

Plaintiff Abby Martin, an advocate for an international consumer boycott of Israel known as the Boycott, Divestment, and Sanctions ("BDS") movement, refused to sign the contract with the certification provision that is required by Georgia state law, claiming that O.C.G.A. § 50-5-85 restricts protected First Amendment speech and expression, but it does no such thing. The First Amendment generally does not protect decisions not to buy or sell goods or services. *See Rumsfeld v. FAIR*, 547 U.S. 47 (2006). And that is all Section 50-5-85 prohibits: it defines a "boycott of Israel" narrowly as "engaging in refusals to deal with, terminating business activities with, or other actions that are intended to limit

---

[1] Plaintiff references Senate Bill 327 throughout her complaint. SB 327, when enacted and signed, added Code Section 50-5-85 to Chapter 5 of Title 50 of the Official Code of Georgia Annotated. Defendants refer herein to the resulting statutory provision, O.C.G.A. § 50-5-85.

commercial relations with Israel or individuals or companies doing business in Israel or in Israeli-controlled territories." O.C.G.A. § 50-5-85(a)(1). Indeed, anyone who contracts with the State may continue to speak out about Israel or even advocate for a boycott by others. The law therefore does not infringe on First Amendment speech or expression. Similarly, the law does not restrict associational rights, because those contracting with the state remain free not only to engage in all manner of speech criticizing and calling for a boycott of Israel, but also to associate with others for the same purposes. Nor does the statute's certification requirement compel speech, because it does not require contractors to express any opinions, ideas or beliefs, much less ones they do not hold. And for reasons discussed below, the statute is not impermissibly vague. This Court should dismiss the amended complaint for failure to state a claim.

## RELEVANT FACTUAL ALLEGATIONS

Martin describes herself as a visual artist, prominent journalist, and supporter of the BDS movement, which "specifically encourages economic divestment from institutions that are not in compliance with established international law related to the Israeli occupation of Palestine." *See* Doc. 26, ¶¶ 4, 9, 21. On July 19, 2019, Georgia Southern University (GSU) invited Martin to act as keynote speaker at an academic conference in exchange for a $1,000 honorarium and travel expenses, an invitation she accepted on July 22. *Id.*, ¶¶ 5, 38-39. Martin avers that defendants Overstreet, Blitch, and Lensch thereafter emailed Martin an agreement for signature which included language certifying that she was not engaged in and, for the duration

of the agreement would not engage in, a boycott of Israel, consistent with the requirements of O.C.G.A. § 50-5-85.[2] *Id.,* ¶¶ 5, 42-43. Martin refused to sign the agreement because of the inclusion of such language and, thus, GSU would not enter into the contract with her, as doing so would be a violation of Georgia law. *Id.*, ¶¶ 5, 44-45, 47. As a result, the conference chairs and committee decided to cancel the conference. *Id.*, ¶¶ 6-7, 49-50.

Martin brings claims under 42 U.S.C. § 1983 for alleged violations of the First and Fourteenth Amendments. She seeks an injunction precluding Defendants from continuing to follow O.C.G.A. § 50-5-85 and preventing them from including the "no boycott of Israel" language in any other state contract, an injunction striking and declaring void the "no boycott of Israel" language in all existing state contracts between the State and any private contractor, and a declaration that O.C.G.A. § 50-5-85 is "unconstitutional and unenforceable statewide." She also seeks compensatory damages and attorney's fees and costs. *Id.*, pp. 25-26.

---

[2] Although Martin has sued Steve Wrigley, Chancellor for the Board of Regents of the University System of Georgia (BOR), and Kyle Marrero, President of GSU, as well as GSU employees Overstreet, Blitch, and Lensch, the statute she challenges is not a policy of either BOR or GSU. Because BOR and GSU are state entities, they are obliged to comply with O.C.G.A. § 50-5-85 when entering into contracts which fall within its purview.

4

## ARGUMENT AND CITATION TO AUTHORITY

### I.   O.C.G.A. § 50-5-85 does not violate the First Amendment.

#### A. O.C.G.A. § 50-5-85 does not regulate speech or inherently expressive conduct.

The First Amendment prohibits states from enacting laws "abridging the freedom of speech." U.S. Const. Amend. I. "'When interpreting this command, [the Supreme] Court has distinguished between regulations of speech and regulations of conduct.'" *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1741 (2018) (Thomas, J., concurring) (quoting *Sorrell v. IMS Health Inc.*, 564 U. S. 552, 567 (2011)). "The latter generally do not abridge the freedom of speech, even if they impose 'incidental burdens' on expression." *Id.* While the expressive nature of some conduct may bring it within the First Amendment's protection, not all conduct intended to express an idea amounts to protected speech. *See, e.g., Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. (FAIR)*, 547 U.S. 47, 66 (2006). Instead, the Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive." *Id.* Because the activity that O.C.G.A. § 50-5-85 restricts is neither speech nor inherently expressive conduct, the statute does not run afoul of the First Amendment.

This is made clear by the Supreme Court's ruling in *FAIR*, which governs this case. *FAIR* involved a First Amendment challenge to the Solomon Amendment, a federal law which conditions the receipt of certain federal funds by colleges and universities on providing military recruiters the same access to their campuses and students that is provided to non-military recruiters. *Id.* FAIR, an association of law

5

schools and faculties, argued that the Solomon Amendment forced law schools to choose between receiving federal funding and exercising their First Amendment right to refuse to deal with military recruiters as a way of expressing their disagreement with the military's "Don't Ask, Don't Tell" policy. *Id.* at 51, 53. In a unanimous decision, the Supreme Court rejected FAIR's claims, finding that the Solomon Amendment regulated neither speech nor protected conduct.

First, as to speech, the Court observed that the Solomon Amendment did not prohibit or compel any actual speech; it "neither limits what law schools may say nor requires them to say anything." *Id.* at 60. Law schools remained free to engage in speech critical of the military and its policies, whether through "help[ing] organize student protests" of the policy or posting "signs on the bulletin board next to the door" where a military recruiter was interviewing, without the loss of federal funding. *Id.* They simply had to refrain from denying military recruiters the same access to their campuses and students that nonmilitary recruiters had. *Id.* The Solomon Amendment, as the Court explained, affected "what law schools must *do* – afford equal access to military recruiters – not what they may or may not *say*." *Id.*

The Court recognized that, to comply with the Solomon Amendment, law schools may be required to provide recruiting assistance to the military which "includes elements of speech," such as sending emails or posting notices on bulletin boards about the time and location a military recruiter would be on campus. *Id.* at 61-62. But it found such requirements a "far cry" from the sort of "compelled speech" held to violate the First Amendment in prior cases. *Id.* (citing *W. Va. Bd. of*

*Educ. v. Barnette*, 319 U.S. 624 (1943) (law requiring students to recite Pledge of
Allegiance and salute flag unconstitutional) and *Wooley v. Maynard*, 430 U.S. 705
(1977) (requiring residents to display "Live Free or Die" motto on license plates
amounted to compelled speech)). And, whereas the laws at issue in *Barnette* and
*Wooley* were *aimed at* requiring the recitation or display of a particular message, the
"compelled speech" of which the law schools complained was "plainly incidental to
the Solomon's Amendment's regulation of conduct." *Id.* at 62. The Court also
rejected the contention that, if law schools treated military and nonmilitary recruiters
alike, as required by the Solomon Amendment, "they could be viewed as sending
the message that they see nothing wrong with the military's policies." *Id.* at 64-65.

  Having determined that the Solomon Amendment did not regulate *speech*, the
Court addressed whether the *conduct* regulated by the law fell within the protections
of the First Amendment. *Id*. at 65-66. The Court held that it did not. *Id*. at 66. The
Court recognized that the law schools intended to express their disagreement with
military policy by refusing to deal equally with military recruiters. *Id.* But it rejected
the notion that "'an apparently limitless variety of conduct can be labeled 'speech'
whenever the person engaging in the conduct intends thereby to express an idea'"
and made clear that First Amendment protection extends "*only* to conduct that is
*inherently expressive*." *Id.* at 66 (emphasis added) (quoting *United States v.
O'Brien*, 391 U.S. 367, 376 (1968)). The conduct at issue was not inherently
expressive, the Court found, because an observer seeing an absence of military
recruiters on campus had no way of knowing that the school was expressing its

disapproval of military policy absent speech explaining as much. *Id*. An observer could just as readily conclude that the absence was the result of the military recruiters' preference to interview off campus or an unavailability of on-campus space. *Id.* Because the conduct at issue was expressive "only because the law schools accompanied [it] with speech explaining it," it was not inherently expressive and did not warrant First Amendment protection. *Id.*

The holding in *FAIR* governs this case. Like the Solomon Amendment, O.C.G.A. § 50-5-85 regulates conduct, not speech. It does not require state contractors to say anything or to refrain from criticizing Israel, expressing support for the BDS movement, or engaging in any other manner of speech. It regulates only commercial conduct – "engaging in refusals to deal," "terminating business activities," and "other actions that are intended to limit commercial relations," *see* O.C.G.A. § 50-5-85(a)(1), leaving untouched any and all speech which may accompany or explain such conduct. Had Martin contracted with GSU (and had the conference not been cancelled), nothing would have precluded her from devoting her entire keynote speech to criticism of Israel and its policies, to expressions of support for the BDS movement, to criticism of O.C.G.A. § 50-5-85, or any other topic. She would remain free to express her views on Israeli policy through any form of speech activity, whether it be protesting, leafleting, writing, or film making. The statute requires only that those who desire to contract with Georgia refrain from refusing to deal, and not terminate any business activities, with Israel-affiliated persons or entities absent a valid business reason. *See* O.C.G.A. § 50-5-85(a). Like

the Solomon Amendment, O.C.G.A. § 50-5-85 "affects what [state contractors] must *do* … not what they may or may not *say*." *FAIR*, 547 U.S. at 60. It restricts conduct, not speech.

Moreover, the conduct regulated by O.C.G.A. § 50-5-85 is not "inherently expressive." *FAIR* dictates such a finding. The Court in *FAIR* specifically addressed whether similar boycotting activity was inherently expressive and concluded that it was not, because explanatory speech was needed for an observer to recognize that a message was being expressed. 547 U.S. at 66. The same is true of the conduct regulated here.[3] Even assuming an observer noticed that a state contractor's private purchases did not include Israel-affiliated goods, such as Sabra hummus, *see* Doc. 26, ¶ 74 (setting forth as an example of BDS boycotting activity the "refus[al] to buy products made by Sabra"), absent explanatory speech, the observer would be left to speculate whether it was some sort of political message or instead (and perhaps more likely) a coincidence, a dislike of the taste of the product, a preference for American products, a function of quality or price, or one of any other number of possible explanations unrelated to expression. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1244 (11th Cir. 2018) ("The critical question is whether the explanatory speech is necessary for the reasonable observer

---

[3] The conduct regulated by O.C.G.A. § 50-5-85 (i.e., the refusal to deal commercially with Israel-affiliated entities because of an objection to Israeli policy) is quite similar to the conduct regulated in *FAIR* (the refusal to deal with military recruiters because of an objection to military policy). Indeed, in their Supreme Court brief, the coalition of law schools that engaged in the refusal to deal with military recruiters in *FAIR* described the refusal as "a limited sort of boycott" of the military. *See* Brief of Respondents, *FAIR*, 2005 U.S. S. Ct. Briefs LEXIS 635 at *55.

to perceive a message from the conduct."). *See also Ark. Times LP v. Waldrip*, 362 F. Supp. 3d. 617, 624 (E.D. Ark. 2019) ("Like the law schools' decision to prevent military recruiters from coming to campus, the decision to engage in a primary or secondary boycott of Israel is expressive only if it is accompanied by explanatory speech.") (internal quotation omitted); *Jordahl v. Brnovich*, No. 18-16896, 2018 U.S. App. LEXIS 31057, at *4-5 (9th Cir. Oct. 31, 2018) (Ikuta, J., dissenting from denial of stay pending appeal) ("Until Jordahl explains that he is engaged in a boycott [of Israel], his private purchasing decisions do not communicate his opinions to the public.").

Nothing about Martin's actions in purchasing one brand over another, or in refraining from purchasing a particular product, is even minimally, much less inherently, expressive in the absence of explanatory speech. The same can be said of any state contractor to which O.C.G.A. § 50-5-85 applies. And, as *FAIR* makes clear, the fact that the regulated activity is politically motivated does not transform what is plainly conduct into protected speech. *See FAIR*, 547 U.S. at 66. Because O.C.G.A. § 50-5-85 restricts neither speech nor protected conduct, Martin's First Amendment claim fails.

Martin contends in her amended complaint that, were she to contract with the State, O.C.G.A. § 50-5-85 "would require her to remove content from her websites and social media accounts, to cease the distribution of her documentary film that calls on people of conscience to join the BDS movement, and otherwise abandon her political beliefs and advocacy." *See* Doc. 26, ¶ 72. This is not so. The definition of a

"boycott of Israel" includes "refusals to deal" and "terminating business activities"
with Israel-related entities, neither of which touches upon Martin's speech activities,
and "other actions that are intended to limit commercial relations with Israel or
individuals or companies doing business in Israel or in Israeli-controlled territories."
O.C.G.A. § 50-5-85(a)(1). Martin relies heavily on the "other actions …" phrase.
But the canon providing that general terms in a list are read in the context of specific
terms in that list, which Georgia courts follow, counsels in favor of reading "other
actions" to cover only commercial conduct, not speech, like the other items listed in
the definition of "boycott." *See, e.g., Montgomery Cty. v. Hamilton*, 337 Ga. App.
500, 507 n.23 (2016). And, under the doctrine of constitutional avoidance, the
statute should be read in a way that avoids any conflict with the First Amendment.
*See Clark v. Martinez*, 543 U.S. 371, 30-381 (2005). *See also Arkansas Times*, 362
F. Supp. 3d at 623 (analyzing the same "other actions" language in Arkansas statute,
which the court held did not violate the First Amendment, and holding that
"[f]amiliar canons of statutory interpretation, such as constitutional avoidance and
edjusdem generis, counsel in favor of interpreting 'other actions' to mean conduct
similar to the listed items."). This comports, moreover, with the common
understanding of the term being defined – "boycott" – as a refusal to deal or contract
with another entity. *See Merriam-Webster.com Dictionary*, https://www.merriam-
webster.com/dictionary/boycott (defining boycott as "engag[ing] in a concerted
refusal to have dealings with (a person, a store, an organization, etc.) usually to
express disapproval or to force acceptance of certain conditions").

Martin's contention that O.C.G.A. § 50-5-85's certification requirement unconstitutionally compels speech fares no better. Of course, "First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say," i.e., from compelling speech. *FAIR*, 547 U.S. at 61. The Supreme Court "ha[s] sustained First Amendment challenges to allegedly compelled expression in two categories of cases." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). The first is "true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government." *Id. See, e.g., Barnette*, 319 U.S. at 633 (holding that a "compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind" and amounts to compelled speech); *Wooley*, 430 U.S. at 715 (requiring Jehovah's Witness to display a motto "Live Free or Die" on a license plate amounts to compelled speech because it "in effect requires that appellees use their private property as a 'mobile billboard' for the State's ideological message"). The second is "'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with." *Johanns*, 544 U.S. at 557.

Martin avers that this case falls into the first category. She contends, in particular, that O.C.G.A. § 50-5-85's certification requirement requires contractors to sign a document "renouncing" political boycotts of Israel and to sign "what is essentially a loyalty oath to a particular foreign county." Doc. 26, ¶¶ 8, 73. This is simply not true. O.C.G.A. § 50-5-85 requires only "written certification that [the

state contractor] is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel." In other words, it mandates only that contractors provide the State with information about whether they meet a particular contracting requirement – a requirement which, as shown, does not implicate the First Amendment. On its face, the statute does not compel contractors to express or espouse any message, idea or belief. Requiring a contractor to certify that she is not engaging in certain consumer conduct, which is itself not protected speech, "is simply not the same as forcing a student to pledge allegiance to the flag or forcing a Jehovah's Witness to display the motto 'Live Free or Die.'" *FAIR*, 547 U.S. at 62 (citing *Barnette*, 319 U.S. 624, and *Wooley*, 430 U.S. 705). Moreover, unlike in *Barnette* and *Wooley*, where the challenged requirements applied to all students and residents, respectively, the requirement at issue here applies only to those who choose to engage in business dealings with the State of Georgia. And, of course, those who choose to contract with the State remain free to voice any message or belief they choose, including opposition to Israel and support for boycotts, without running afoul of O.C.G.A. § 50-5-85.

Moreover, the certification to which Martin objects is "plainly incidental to [O.C.G.A. § 50-5-85]'s regulation of conduct." *FAIR*, 47 U.S. at 62. In *FAIR*, the Supreme Court recognized that, to comply with the Solomon Amendment, law schools may be required to send emails or post notices which included "elements of speech." *Id.* at 61-62. But because such speech was purely incidental to the government's regulation of conduct, which itself was not inherently expressive,

13

there was no First Amendment problem. *Id.* at 62. The same is true here. The sole prescription of O.C.G.A. § 50-5-85 is conduct-based: it precludes contractors from engaging in refusals to deal with Israel and related entities. The certification is merely a method of verifying that a contractor meets this governmental contracting requirement. Because O.C.G.A. § 50-5-85 does not compel Martin (or any state contractor) to speak in violation of the Free Speech Clause, her claim based on a compelled speech theory fails.[4]

Finally, Martin appears to bring an overbreadth challenge to the statute. *See* Doc. 26, ¶ 77 ("SB 327 is substantially overbroad"). "The overbreadth doctrine is 'strong medicine' that generally should be administered 'only as a last resort." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). A statute is facially overbroad only when it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601 615 (1973)). *See also Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 497 (1982) ("A law that does not reach constitutionally protected conduct … satisfies the overbreadth test."). Moreover, this Court "must construe the [statute] to avoid constitutional overbreadth problems." *Locke*, 634 F.3d at 1191. Because O.C.G.A. § 50-5-85 does

---

[4] To the extent the amended complaint advances a "compelled speech" theory based on the contention that state contractors "would have to abandon … consumer choice[s]" to comply with the statute (*see* Doc. 26, ¶ 74), the theory likewise fails because, as discussed, such purchasing choices do not amount to "inherently expressive conduct" to which First Amendment protection extends.

14

not regulate speech or inherently expressive conduct at all, much less a substantial amount of it, any overbreadth challenge necessarily fails.

### B. *Claiborne Hardware* does not hold that refusals to deal are protected conduct under the First Amendment.

Despite its clear applicability here, and perhaps because of it, *FAIR* is not one of the multiple Supreme Court cases cited in Martin's complaint. Instead, Martin cites *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), for the proposition that participation in a politically-motivated consumer boycott is protected conduct under the First Amendment. *See* Doc. 26, ¶ 61. But Martin overstates the holding in *Claiborne*. *Claiborne* held that many of the activities that often *accompany* economic boycotts – such as holding meetings, making speeches, marching, and peaceful picketing – are forms of speech. 485 U.S. at 909-911. But unlike *FAIR*, the *Claiborne* Court did not have occasion to consider whether the refusal to deal aspect of a boycott – the only conduct regulated by O.C.G.A. § 50-5-85 – is entitled to First Amendment protection, and, thus, did not make such a holding.

*Claiborne* involved a consumer boycott of white-owned businesses in Port Gibson, Mississippi organized by civil rights activists to protest racial discrimination. 485 U.S. at 889. White merchants brought suit against those involved in the boycott, alleging violations of state tort law. *Id.* at 889-890. The Mississippi courts held most of defendants liable for the tort of malicious interference with the plaintiffs' businesses and rejected the defendants' reliance on the First Amendment, reasoning that the use of force, violence, and threats by some

15

boycotters made the entire boycott unlawful. *Id.* at 895. The Supreme Court reversed the decision of the Mississippi courts.

In doing so, the Court first observed that the boycott at issue 'took many forms" and consisted of numerous "elements," some of which were protected and others of which were not. *Id.* at 907. The Court pointed, in particular, to peaceful picketing, marches, speeches, gathering for meetings, urging others to join the boycott, submitting written demands, sending telegrams, and publishing names of non-boycotters in the newspaper and explained, not surprisingly, that "[e]ach of *these elements* of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments." *Id.* (emphasis added); *see also id.* at 911 (stating that "the boycott clearly *involved* constitutionally protected activity" and identifying the protected activity as "speech, assembly, association, and petition") (emphasis added). But the boycott also included elements of "unlawful conduct" – in particular, violence and threats of violence – which were prohibited by state law and which, the Court observed, were not protected by the First Amendment. *Id.* The Court held that the elements of the boycott that involved protected First Amendment activity did not lose constitutional protection simply because they were accompanied by unprotected elements. *Id.* at 924-925. Accordingly, the Court held that protected First Amendment activity could not be the basis for common law tort liability for damages.

The Court in *Claiborne* did not hold, however, that the boycotters' refusal to purchase from white merchants was a constitutionally protected element of the

boycott or that it was "inherently expressive" conduct under the First Amendment. It did not have occasion even to address the issue, because such conduct was not unlawful under Mississippi law.[5] The Court likewise had no occasion to address the question of whether the government may restrict the "refusal to deal" conduct which underlies a boycott while leaving untouched the accompanying protected speech activity (as O.C.G.A. § 50-5-85 does). *FAIR* did have occasion to do so, however, and it upheld such a restriction. This Court should as well.

The notion that First Amendment protections for the speech, assembly, and association that often accompany boycotts necessarily extend to the refusal to deal aspect of a boycott was also rejected in *International Longshoremen's Ass'n v. Allied International, Inc*., 456 U.S. 212 (1982). There, members of a longshoremen's union refused to unload cargo arriving from or destined for the Soviet Union as a means of protesting the Russian invasion of Afghanistan. *Id.* at 214. After determining that the union's boycott was an illegal secondary boycott under the National Labor Relations Act, the Court summarily and unanimously rejected the union's First Amendment defense. *Id.* at 226-227. The Court noted that "[t]here are many ways in which a union and its individual members may express their opposition to Russian foreign policy" and declined to find that the boycott of Soviet goods, though part of a broader, politically motivated boycott which included protected speech, was itself protected by the First Amendment. *Id.* Noting that it had

---

[5] Indeed, the Court expressly reserved the question of whether a boycott "designed to secure aims that are themselves prohibited by a valid state law" is constitutionally protected. *Id.* at 915 n. 49.

"consistently rejected the claim that secondary picketing by labor unions … is protected activity under the First Amendment," the Court reasoned that "[i]t seems still clearer that conduct not designed to communicate but to coerce merits still less consideration under the First Amendment." *Id*. The conduct regulated by O.C.G.A. § 50-5-85, which also arises out of a political dispute with a foreign nation and seeks to coerce a change in behavior through infliction of economic pain, is no different.

It is perhaps not surprising, then, that a district court in Arkansas, when recently considering a First Amendment challenge to a very similar state law which likewise prohibits state entities from contracting with companies that boycott Israel, found *FAIR* and *Longshoremen's* controlling. *See Ark. Times*, 362 F. Supp. 3d. 617 (E.D. Ark. 2019). In its well-reasoned decision, the court found unpersuasive the plaintiff's contention that *Claiborne* created an unqualified First Amendment right to engage in political boycotts and observed that *Claiborne* neither addressed the "refusal to deal" aspect of a boycott nor held "that individual purchasing decisions are constitutionally protected." *Id*. at 625, 626. And, the court found, the Supreme Court in *Longshoremen's* "held that there is no unqualified right to boycott or a constitutional right to refuse to deal, or perhaps no First Amendment interest in boycotting at all." *Id*. at 626. The court found that *FAIR* and *Longshoremen's*, not *Claiborne*, controlled the case before it and compelled a finding that the statute's "no boycott of Israel" requirement regulated neither speech nor inherently expressive conduct. *Id*. at 624. The complaint was, accordingly, dismissed for

failure to state a claim under the First Amendment.[6] *Id.* at 626. This Court should do the same here.

Defendants are aware of two other district court decisions on similar state statutes. The district courts in those two cases preliminarily enjoined enforcement of laws similar to O.C.G.A. § 50-5-85. *See Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) and *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018). But the outcome in those cases was based on reasoning which, Defendants submit, cannot be squared with the Supreme Court cases discussed above and should not be followed by this Court. The *Jordahl* court, while recognizing that "the commercial actions (or non-actions) of one person, e.g., the decision not to buy a particular brand of printer to show support for a political position, may not be deserving of First Amendment protections on the grounds that such action is typically only expressive when explanatory speech accompanies it," nonetheless distinguished *FAIR* as inapplicable to such boycotting activity when "taken in response to larger calls to action" (*id.* at 1042-1043) – a wholly untenable distinction in light of the fact that the boycott of military recruiters at issue in *FAIR* was itself part of a larger, nationwide protest against the military's "Don't Ask, Don't Tell" policy. And the *Jordahl* court incorrectly found that *Claiborne* extended First Amendment protection to private purchasing decisions and "refusals to deal" whenever such conduct is undertaken as part of a larger effort to achieve a common political, social,

---

[6] The plaintiff has appealed the dismissal, and the appeal, which has been briefed and argued, is currently pending in the Eighth Circuit.

or economic aim. *Id.* at 1041-1042. Such a reading of *Claiborne* is foreclosed by *FAIR*, which upheld a law precluding refusals to deal even in such a context.[7]

The District Court of Kansas' preliminary injunction of a law similar to O.C.G.A. § 50-5-85 in *Koontz* is likewise unpersuasive. First, and notably, in its brief in opposition to the motion, Kansas failed even to address the merits of the plaintiff's First Amendment challenge to the statute, essentially leaving the issue uncontested. *See* 283 F. Supp. 3d at 1023. Second, relying on *Claiborne*, the court incorrectly found that the purely economic conduct prohibited by the Kansas law was protected by the First Amendment simply because it was part of a larger movement which sought to express dissatisfaction with a government policy and influence government action. *Id.* at 1021-1022. But, as discussed, *Claiborne* did not even have occasion to address whether the refusal to deal aspect of a boycott is protected conduct. *FAIR* did, however, and it held that, even in the context of a larger political movement, such conduct is not protected. Finally, in an effort to distinguish *FAIR*, the court simply stated, incorrectly and without explanation, that whereas the politically-motivated boycotts of military recruiters in *FAIR* were not inherently expressive, "[i]t is easy" to associate an individual's refusal to deal with Israel-related entities with "the message that the boycotters believe Israel should

---

[7] Based on its analysis, the district court in *Jordahl* granted the plaintiff's motion for a preliminary injunction, and the defendants appealed. *See Jordahl v. Brnovich*, 789 F. App'x 589 (9th Cir. 2020). While the appeal was pending, Arizona amended portions of the statute which rendered it inapplicable to the defendants. *Id.* at 591. The Ninth Circuit found the plaintiff's claims for declaratory and injunctive relief moot, vacated the preliminary injunction, and remanded the case with instructions to the district court to dismiss the claims. *Id.*

improve its treatment of Palestinians." *Id*. at 1023-1024. For the reasons discussed above, however, it is not.[8]

### C. Even if O.C.G.A. § 50-5-85 burdens speech, the burden is incidental and furthers a substantial state interest.

As discussed, *FAIR* held that a refusal to deal with military recruiters was not inherently expressive conduct and thus did not implicate the First Amendment. But *FAIR* also made plain that, even if the Solomon Amendment burdened the law schools' speech, it would have been subject only to intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), and, moreover, it would pass such scrutiny. *FAIR*, 547 U.S. at 67. The same is true of O.C.G.A. § 50-5-85.

Under the test for neutral regulations on expressive conduct established in *O'Brien*, "'an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *FAIR*, 547 U.S. at 67 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). *See also O'Brien*, 391 U.S. at 377. O.C.G.A. § 50-5-85 satisfies this test. First, the regulation is neutral. It applies to refusals to deal with Israel-related entities regardless of the viewpoint motivating the boycott. And while Martin complains that it targets only boycotts directed at Israel and not other nations (*see* Doc. 26 at ¶¶ 67-69), O.C.G.A. § 50-5-85 is akin in this manner to the hundreds of

---

[8] Following the entry of a preliminary injunction by the district court in *Koontz*, the parties reached a settlement, the case was voluntarily dismissed, and the preliminary injunction was dissolved. *See Koontz v. Watson*, Case No. 5:17cv4099 (D. Kan. 2017) at Doc. 33.

state and federal anti-discrimination statutes which target only a subset of discrimination and which have nonetheless been found to be "permissible content-neutral regulation[s] of conduct." *See Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (observing that Title VII, which prohibits discrimination in employment on the basis of certain characteristics, has been found to be content-neutral in the face of First Amendment challenges). Indeed, the Solomon Amendment, which likewise targeted only one type of boycott, was described by the Supreme Court in *FAIR* as a "neutral regulation," 547 U.S. at 67.[9]

Second, any "burden" on speech resulting from O.C.G.A. § 50-5-85 is incidental. In *FAIR*, the Supreme Court recognized that the Solomon Amendment had the effect of, for example, requiring law schools to include military recruiters in interviews and recruiting receptions, sending out emails on the recruiters' behalf, and distributing or posting flyers for them. 547 U.S. at 61-62. But the Court found such burdens "plainly incidental to the Solomon Amendment's regulation of conduct," observing that "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies." *Id.* at 65. The same is true here. Nothing about O.C.G.A. § 50-5-85's very targeted requirement that Martin, or any state contractor, certify that it is not currently engaged in (and for the

---

[9] Martin's contention that the statute is not a neutral regulation of boycotts because it does not regulate refusals to purchase from Israel for legitimate business reasons (*see* Doc. 26 at ¶ 68) fails because decisions not to purchase based on valid business reasons are not properly characterized as a boycott.

term of the contract will not engage in) a boycott of Israel suggests that the contractor agrees with Israeli policies. Moreover, like the Solomon Amendment, nothing in O.C.G.A. § 50-5-85 restricts what a contractor may say, or requires them to say anything, about Israel or its policies. And any burden on speech is incidental for the additional reason that anyone can, of course, simply refrain from contracting with Georgia to avoid even its targeted regulation of commercial conduct.

Finally, O.C.G.A. § 50-5-85 promotes a substantial state interest – namely, Georgia's interest in helping advance a long-standing federal foreign policy goal. This interest is apparent from the face of the statute, which defines a refusal to deal as an impermissible "boycott of Israel" when the refusal is taken in "compliance or adherence to calls for a boycott of Israel other than those boycotts to which 50 U.S.C. App. Section 2407(c) … applies." O.C.G.A. § 50-5-85 (a)(1)(A). The statute's citation is to the Export Administration Act (EAA), a federal law which has banned boycotts of "friendly" nations, including Israel, for over forty years. *See* 50 U.S.C. §§ 4841-4842; *Israeli Aircraft Indus., Ltd. v. Sanwa Bus. Credit Corp.*, 850 F. Supp. 686, 689-90 (N.D. Ill. 1993). The EAA directs the "President [to] issue regulations prohibiting any United States person" from undertaking various actions "[w]ith the intent to comply with, further, or support any boycott" imposed by a foreign country against a country friendly to the United States, including "[r]efusing, or requiring any other person to refuse, to do business with or in the

boycotted country." 50 U.S.C. § 4842(a)(1)(A).[10] The laws comprising the EAA have been subject to numerous constitutional challenges, none of which has succeeded. *See e.g.*, *Int'l Longshoremen*, 456 U.S. at 226 (citing *NLRB v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 616 (1980); *American Radio Assn. v. Mobile S.S. Assn.*, 419 U.S. 215, 229–32 (1974); *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984).

Because BDS boycotts are not imposed by a foreign country, they fall outside of the EAA. Nonetheless, federal policy regarding BDS boycotts makes clear that these efforts are likewise contrary to the United States' interests. *See* 19 U.S.C. § 4452. Congress "opposes politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel, such as boycotts of, divestment from or sanctions against Israel [i.e., BDS campaigns]" and has explained that such boycotts "are contrary to the principle of nondiscrimination[.]" *Id.* § 4452(b)(4)–(5). Congress has also identified as a "principal trade negotiating objective[] of the United States" the discouragement of "politically motivated boycotts of, divestment from, and sanctions against Israel[.]" *Id.* § 4452(c).

Georgia has made clear through the passage of O.C.G.A. § 50-5-85, which specifically and narrowly defines the conduct regulated with reference to the EAA and refusals to deal undertaken in a discriminatory manner, its interest in furthering the long-standing foreign policy objectives of the United States as it pertains to

---

[10] The EAA was re-enacted by Congress in 2018 as part of the Defense Authorization Act. *See* Anti-Boycott Act of 2018, Pub. L. No. 115-232 §§ 1771-74.

boycotts of Israel. *See* 50-5-85(a)(1). And the state seeks to advance those objectives by imposing similar regulations of commercial transactions. In short, O.C.G.A. § 50-5-85 aligns Georgia with long-established foreign policy goals of the United States, and it does so by mirroring the constitutionally sound federal law which implements those goals. Certainly a state has, at minimum, a substantial interest in doing so. *See IBEW v. NLRB*, 341 U.S. 694, 705 (1951) (reasoning that the Supreme Court recognized the constitutional right of the states to proscribe picketing in furtherance of secondary boycotts and thus "[t]here is no reason why Congress may not do likewise.").

**D. O.C.G.A. § 50-5-85 does not regulate expressive association.**

Martin also alleges that O.C.G.A. § 50-5-85 infringes on her First Amendment right of association. The Supreme Court has long "recognized a First Amendment right to associate for the purpose of speaking, which [it has] termed a 'right of expressive association.'" *FAIR*, 547 U.S. at 68. *See also Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) ("implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"). Martin appears to contend that O.C.G.A. § 50-5-85 runs afoul of this right by precluding those who contract with the state from participating in group criticism of, and joint calls to boycott, Israel. *See* Doc. 26, ¶ 62 (asserting that O.C.G.A. § 50-5-85 chills or prohibits the ability to "[j]oin[] voices together to participate in and call for political boycotts"); *id.*, ¶¶ 3, 70, 76 (suggestion that

O.C.G.A. § 50-5-85 requires contractors to refrain from associating with others who "advocate for Palestinian rights by boycotting Israel").

Her claim fails because the statute imposes no such prohibition. Just as those contracting with the state remain free to engage in speech criticizing and calling for a boycott of Israel, *see supra*, they remain free to associate with others for the same purpose. Nothing in O.C.G.A. § 50-5-85 affects with whom contractors may meet, what groups they may join or continue to remain a part of, or the composition of any such groups. The mere requirement that a contractor refrain from refusing to do business with a person or entity based solely on a connection with Israel does not impinge upon, or even implicate, the contractor's right to associate with anyone. *See FAIR*, 547 U.S. at 69-70 (Solomon Amendment did not violate law schools' freedom of association because, although it required them to interact with military recruiters, it did not force law schools to accept them as "part of the law school" and did not prevent students and faculty from associating together to voice their disapproval of the military). Like her freedom of speech claim, Martin's freedom of association claim fails.

## II. Georgia may impose conditions, such as the commercial regulations set forth in O.C.G.A. § 50-5-85, on those who voluntarily choose to contract with the state.

O.C.G.A. § 50-5-85 also passes constitutional muster because it operates not as a direct prohibition of all refusals to deal with Israel-related entities, but solely as a condition on the receipt of state funds for those who choose to contract with Georgia. The Supreme Court has long distinguished between laws falling into the

former category from those falling into the latter, recognizing that the government may establish criteria for the receipt of government funds that may not be permissible as a direct regulation of speech. *See, e.g., Nat'l Endowment for the Arts v. Finley* (*NEA*), 524 U.S. 569, 587-88 (1998) ("although the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake"); *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers*, 485 U.S. 360, 364-66 (1988) (rejecting First Amendment challenge to regulations denying food stamps to striking workers). And, relatedly, while the government cannot abridge the freedom of speech, it is not required to subsidize the speech or activities of others. *See, e.g., Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 545-546, 549 (1983) (rejecting the "'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State'" and upholding federal statute giving less favorable tax treatment to non-profit organizations that engaged in lobbying); *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) ("While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones.").

This applies not only in the context of government subsidies, but in the context of government contracts as well. "Governmental entities make a wide range of decisions in the course of contracting for goods and services," and the Supreme Court has recognized that "[t]he Constitution accords government officials a large

27

measure of freedom as they exercise the discretion inherent in making those decisions." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 724-725 (1996). Indeed, the federal government has greater leeway in the spending power context precisely because "[l]egislation enacted pursuant to the spending power is much in the nature of a contract." *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006).

The rationale underlying these principles is clear. First, because a person or entity can opt not to contract with the government or accept government funding, any potential interference with constitutional rights is generally minimal. *See, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*. (*USAID*), 570 U.S. 205, 214 (2013) ("[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds"); *FAIR*, 547 U.S. at 59 ("Congress' power to regulate military recruiting under the Solomon Amendment is arguably greater because universities are free to decline the federal funds."); *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984) (in private university's challenge to Title IX, reasoning that "Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept."). Unlike direct regulation, conditions associated with a subsidy or government contract are not generally imposed; rather, they provide a financial incentive for *voluntary* action. Anyone who does not wish to support a policy reflected in a government procurement law can do so simply by declining to sell goods or services to the government or declining the subsidy at issue.

28

Second, the government generally has a more substantial interest in allocating its limited resources in a manner that best furthers its objectives than it does in directly regulating conduct. *See, e.g., Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity") (quoting *Maher v. Roe*, 432 U.S. 464, 475 (1977)). Thus, the government "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193.

The same rationales apply here. Indeed, the leeway accorded states when acting as contractors (and not as pure regulators) should be at least as broad as that of the federal government exercising its spending power through legislation, which is, as mentioned, only "in the nature of a contract." *Arlington Cent. Sch. Dist.*, 548 U.S. at 296. Just as an entity may decline federal funds to avoid compliance with a condition it prefers not to meet, any person or entity may decline to contract with the State of Georgia if he or she wishes to refuse to remain open to commercial transactions with Israel-related entities. And just as the federal government may choose to fund a program dedicated to advancing certain permissible goals even though doing so necessarily discourages alternative goals, *see Rust*, 500 U.S. at 194, Georgia may choose to advance its goal of furthering federal trade policies by contracting only with those who commit not to boycott Israel, as the statute limits that phrase, for the term of the contract. It is doubtful that anyone would question a

state requirement that a contractor not discriminate in hiring practices or a state decision to fund recycling campaigns but not some other alternative. Both reflect legitimate interests that at state may further through contracting incentives. Here, Georgia is similarly furthering its legitimate interests through the contracting conditions in O.C.G.A. § 50-5-85. Moreover, if Martin's refusal to deal amounts to expressive conduct as Martin suggests (but the law does not support), then Georgia's decision not to contract with those who refuse to deal commercially with Israel is necessarily expressive as well. Georgia should no more be forced to express Martin's message or that of the BDS movement, or to associate itself with such message, than the reverse. Martin cannot have it both ways.

It is true that, while broad, Congress's use of its spending power is not unlimited, and other constitutional provisions, including the First Amendment, may provide an independent bar to a conditional grant of government funds. Thus, the Supreme Court has declined to uphold spending power legislation aimed at the suppression of "dangerous ideas," *NEA*, 524 U.S. at 587, and has distinguished between defining the limits of a government program and leveraging funding to regulate speech beyond the contours of the program, *USAID*, 570 U.S. at 214-215. But even assuming similar limitations apply to a state's contracting activity, neither of these concerns applies here. O.C.G.A. § 50-5-85 only requires that those who contract with the state not be actively engaged in a refusal to deal with Israel-related entities during the term of the contract. The statute neither regulates nor seeks to suppress any associated idea or message that Martin, or any contractor, wishes to

express. And the condition O.C.G.A. § 50-5-85 imposes on state contracts – i.e., they must refrain from refusing to deal commercially with Israel and Israel-related entities – is not "beyond the contours of the program." The statute only applies to the contracting practices of the parties to state contracts, and Georgia has substantial interests in promoting long-standing federal foreign policy goals which Georgia supports.

## III.  O.C.G.A. § 50-5-85 is not unconstitutionally vague.

In her second and only other count, Martin argues that O.C.G.A. § 50-5-85 is impermissibly vague in violation of the Fourteenth Amendment. Doc. 26, ¶¶ 94-95. She alleges, in particular, that she and others will be chilled or effectively prohibited from contracting with the state on the basis of the statute's "vague certification requirement" that prohibits "boycott[s] of Israel." *Id.* It appears that she makes both an as-applied and facial challenge based on vagueness. Both fail.

First, when a statute or regulation does not affect constitutionally protected conduct, it will survive a facial challenge unless "the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494-95 (1982). *See also Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (rejecting First Amendment and vagueness challenge to city ordinance and observing that, "[t]o succeed on a claim that an ordinance is void for vagueness, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.'") (quoting *Vill. of Hoffman* 455 U.S. at 497); *Ala. Educ. Ass'n v. State Superintendent of Educ*., 746 F.3d 1135,

1138 (11th Cir. 2014) ("An enactment that is not impermissibly vague in all its applications will survive a vagueness challenge."). Here, as shown, O.C.G.A. § 50-5-85 does not regulate constitutionally protected conduct, and Martin does not plausibly allege, and cannot plausibly show, that the statute is impermissibly vague in all of its applications. The term "boycott of Israel" plainly applies to a range of easily identifiable conduct. It would apply without question, for example, to the refusal by a state contractor to purchase products from Hewlett Packard simply because Hewlett Packard does business in and with Israel, and not for a valid business reason. Because Martin cannot show that the law is impermissibly vague in all its applications, her facial vagueness challenge fails.

Second, whether her due process challenge is facial, as applied, or both, it fails because O.C.G.A. § 50-5-85 provides adequate notice of what its prohibition on "boycott[s] of Israel" includes. The void for vagueness doctrine focuses on two issues: (1) whether the statute provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; and (2) whether the statute authorizes or encourages arbitrary and discriminatory enforcement. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999). The Constitution does not, however, "require perfect clarity in the language of statutes and ordinances." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018). Indeed, the Supreme Court has recognized that, "because we are 'condemned to the use of words, we can never expect mathematical certainty from our language.'" *Hill*, 530 U.S. at 733 (quoting *Grayned v. City of*

*Rockford*, 408 U.S. 104, 110 (1972)). "[P]erfect clarity and precise guidance have never been required, even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Here, as shown above, "boycott of Israel" is defined in the statute in a manner which limits the term to *commercial conduct* with Israel or Israel-related businesses. Importantly, the statute defines "boycott" in a manner which comports with the common understanding of the term – a refusal to deal or contract with another entity. *See Merriam-Webster.com Dictionary* (defining boycott as a refusal to deal with another entity); *Boos v. Berry*, 485 U.S. 312, 332 (1988) (vagueness tests whether the statute communicates its reach in words of common understanding). It thereby conveys the proscribed conduct in terms that are understandable to persons of reasonable intelligence. And Martin points to nothing in the statute which authorizes arbitrary and discriminatory enforcement. O.C.G.A. § 50-5-85 is not impermissibly vague, and Martin's Fourteenth Amendment claim fails.

## IV. Defendants Overstreet, Blitch, and Lensch are entitled to qualified immunity.

Alternatively, defendants Overstreet, Blitch, and Lensch are entitled to qualified immunity. "'[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). The test for qualified immunity is two-pronged: (1) was the government official acting within the scope of her discretionary authority; and (2) did the

official's conduct violate "clearly established law." *Maggio v. Sipple*, 211 F. 3d 1346, 1350 (11th Cir. 2000). As far as the first prong, the question is whether the official was performing a legitimate job-related function through means that were within her power to utilize. *See, e.g., Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). "Once the defendant establishes that she was acting within her discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir. 2002). To carry that burden, the plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred. *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The "salient question" is whether the law, at the time of the incident gave the defendant "fair and clear warning" that his or her conduct was unconstitutional. *Id.* at 746. Liability only attaches if the official's act is "so obviously wrong, in light of pre-existing law, that only a plainly incompetent [official] or one who was knowingly violating the law would have done such a thing." *See Row v. Fort Lauderdale*, 279 F.3d 1271, 1280 (11th Cir. 2002).

The amended complaint makes clear that, at all times relevant to Martin's allegations, defendants Overstreet, Blitch, and Lensch were acting within their duties as employees of GSU; thus, they were acting within the scope of their discretionary authority and pursuant to Georgia law. The burden is on Martin to show that qualified immunity is not appropriate. She cannot make this showing because, as discussed above, no constitutional violation is plausibly pled in the amended complaint. Regardless, Martin cannot show a violation of a clearly

established right. There is no law clearly establishing that decisions not to buy or sell goods or services, even if part of a politically motivated boycott, are protected by the First Amendment. Instead, the governing law indicates otherwise. *See FAIR*, 547 U.S. 47. Moreover, neither O.C.G.A. § 50-5-85 nor any similar law has been interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. There is simply no clearly established law that could have placed these individuals on notice that merely drawing Martin's attention to the challenged language in the contract or transmitting the contract to her for signature – which is the only conduct in which they are alleged to have engaged – would alone amount to a violation of Martin's constitutional rights. Accordingly, defendants Overstreet, Blitch, and Lensch are entitled to qualified immunity, and Martin's claims against them should be dismissed on this alternative basis.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and dismiss the claims asserted in this action.

Respectfully submitted this 15th day of September, 2020.

CHRISTOPHER M. CARR      112505
Attorney General

KATHLEEN M. PACIOUS      558555
Deputy Attorney General

ROGER A. CHALMERS      118720
Senior Assistant Attorney General

/s/*Deborah Nolan Gore*
DEBORAH NOLAN GORE      437340
Assistant Attorney General

PLEASE SERVE:

Deborah Nolan Gore
40 Capitol Square, S.W
Atlanta, GA  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-6920
dgore@law.ga.gov

36

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point New Times Roman type face.

This 15th day of September, 2020.

*/s/ Deborah Nolan Gore*
DEBORAH NOLAN GORE
Georgia Bar No. 437340

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record in this case.

This 15th day of September, 2020.

/s/ *Deborah Nolan Gore*
DEBORAH NOLAN GORE

Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, GA  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-6920
dgore@law.ga.gov