## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ABBY MARTIN,

      Plaintiff,

v.

STEVE WRIGLEY, Chancellor for the Board of Regents of the University System of Georgia, in his official capacity, *et al.*,

      Defendants.

Civil Action No. 1:20-cv-00596-MHC
Hon. Judge Mark H. Cohen

## BRIEF IN OPPOSITION OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

FACTUAL ALLEGATIONS ................................................................ 3

ARGUMENT ...................................................................................... 4

I.    The Anti-BDS Law is a speech and expressive conduct regulation in violation of the First Amendment. ................................................. 4

    A.    Martin's boycott is constitutionally protected under *Claiborne*. ....... 6

    B.    *Claiborne*, not *FAIR*, applies. ............................................. 8

    C.    The text of Georgia's Anti-BDS Law makes clear that speech is a necessary component of the conduct it prohibits. .................................... 10

    D.    The Anti-BDS Law burdens speech and does not further a substantial state interest. ......................................................... 13

    E.    *Arkansas Times* was wrongly decided. ............................................. 17

    F.    *Longshoreman* and *Briggs* do not apply. ........................................ 17

II.   The Anti-BDS Law is unconstitutional compelled speech. .................... 18

III.  The Anti-BDS Law is unconstitutionally vague ................................... 20

IV.   The Anti-BDS Law is overbroad. ....................................................... 25

V.    Georgia cannot impose unconstitutional conditions on contracts. ........... 27

VI.   The First Amendment violation is clearly established. ........................... 30

CONCLUSION .................................................................................. 31

TABLE OF AUTHORITIES

## Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .........................................................................................18, 19, 27, 29

*Allred v. City of Carbon Hill, Ala.*, 13-cv-00930, 2014 WL 5426822 (N.D. Ala. Oct. 24, 2014) ........................................................................................ 30

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019) ........................................................................ 7, 12, 17, 21, 26

*Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d. 617 (E.D. Ark. 2019) ..... 7, 16

*Bd. of Ancient Order of Hibernians v. Dinkins,* 814 F. Supp. 358 (S.D.N.Y. 1993) ..................................................................................................... 14

*Boos v. Barry,* 485 U.S. 312 (1988.............................................................. 13

*Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984) ............... 17

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)................................................ 25

*Coates v. Cincinnati*, 402 U.S. 611 (1971) .................................................... 20

*Cole v. Richardson*, 405 U.S. 676 (1972) ................................................ 18, 27

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ................................................ 26

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568 (1988)........................................................................ 30

*Fla. Gulf Coast Bldg. and Const. Trades Council v. N.L.R.B.*, 796 F.2d 1328 (11th Cir. 1986)............................................................................................ 30

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) ............................................................................................ 9

*FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990) .... 9, 30

*Hansen v. Soldenwagner*, 19 F.3d 573 (11th Cir. 1994) ................................ 30

*Hill v. Houston*, 764 F.2d 1156 (5th Cir. 1985) ............................................ 26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) .................................................................................................................. 14

*International Longshoreman's Association v. Allied International, Inc.*, 456 U.S. 212 (1982) ........................................................................................ 9, 10

*Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281 (D. Md. 1988) .. 14

*Jordahl v. Brnovich,* 336 F. Supp. 3d 1016 (D. Ariz. 2018)......... 7, 9, 12, 17, 29

*Koontz v. Watson,* 283 F. Supp. 3d 1007 (D. Kan. 2018) ................ 7, 12, 18, 19

*Longshoremen* ............................................................................................... 16

*NAACP v. Button*, 371 U.S. 415 (1963)........................................................ 20

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).............................. .............................................1, 5, 6, 7, 8, 9, 10, 12, 15, 16, 17, 18, 23, 29, 30

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996).......... 27, 28

*R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377 (1992)........................ 12, 14, 23

*Ray v. Edwards*, 725 F.2d 655 (11th Cir. 1984) .............................................. 30

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................... 13, 14

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .................. 7, 8, 9, 15, 16, 19, 20, 23, 30

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................................ 28

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................... 20

*Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164 (11th Cir. 2018).. 22

*U.S. v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921) .......................................... 21

*U.S. v. Natl. Dairy Products Corp.*, 372 U.S. 29 (1963) .................................. 22

*U.S. v. Stevens*, 130 S. Ct. 1577 (2010) .......................................................... 25

*United States v. Albertini*, 472 U.S. 675 (1985) ............................................. 15

*United States v. O'Brien*, 391 U.S. 367 (1968) .......................................... 15, 16

*United States v. Williams*, 553 U.S. 285 (2008) ............................................. 25

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489
(1982).......................................................................................................... 22, 25

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002).......................................... 30

*Virginia v. American Booksellers Association,* 484 U.S. 383 (1988) ............... 22

*Virginia v. Hicks*, 539 U.S. 113 (2003)............................................................ 26

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)............................ 18

*Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996)................................... 27, 28

*Washington State Grange v. Washington State Republican Party*, 552 U. S.
442 (2008)........................................................................................................ 25

*Wooley v. Maynard*, 430 U.S. 705 (1977) ........................................................ 18

## Statutes

42 U.S.C. § 1983.................................................................................................. 3

O.C.G.A. § 50-5-85 .................................................................................... 2, 3, 26

O.C.G.A. § 50-5-85(a) ................................................................................... 8, 20

O.C.G.A. § 50-5-85(b) ....................................................................................... 2, 8

## Other Authorities

Amanda McCaffrey, *Airbnb's Listings in Disputed Territories: A Tortured
Compromise*, Just Security (July 29, 2019) ................................................. 11

Elizabeth Findell, *Airbnb reverses policy that landed it on Texas' anti-Israel
list*, AUSTIN-AMERICAN STATESMAN (Apr. 9, 2019) ............................... 11

Elizabeth Findell, *In pro-Israel move, Texas books boycott of Airbnb*, AUSTIN
AMERICAN STATESMAN (Mar. 11, 2019) ................................................. 11

## INTRODUCTION

From the colonial boycotts on British tea hundreds of years ago to the present, boycotts organized to bring about political change have always occupied hallowed grounds in our history. The Civil Rights Movement relied heavily on boycotts to combat racism and spur societal change. Cesar Chavez led the United Farm Workers grape boycott that from 1965-1970 brought millions of Americans together to win better working conditions and labor recognition. The Anti-Apartheid Movement in this country helped catalyze opposition to Apartheid South Africa across the globe.

And our jurisprudence reflects the fundamental importance of boycotts. The Supreme Court long ago recognized that boycotts intended to advance civil rights constitute "form[s] of speech or conduct that [are] ordinarily entitled to protection under the First and Fourteenth Amendments." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). It is this seminal case that controls the outcome here.

Abby Martin is a prominent journalist whose job and First Amendment rights permit her to criticize state-sanctioned oppression. Like every other American, Martin has that constitutional right to boycott and protest violence, whether by abstaining from economically supporting oppressive regimes or speaking out against their crimes. By extension of her work, she frequently

1

expresses views critical of the Israeli government, primarily by supporting the Boycott, Divestment, and Sanctions movement.

In 2019, Martin released her documentary film, *Gaza Fights for Freedom*, during which she calls on viewers to support the BDS movement, a call intended to limit commercial relations with Israel. Before Georgia and more than two dozen other states passed laws to specifically suppress this viewpoint, her decision to exercise her rights in this manner triggered no legal disability. In the aftermath of these statutes, Abby Martin and countless others are now coerced by law into abandoning their political beliefs and signing certifications demanding they disavow their political beliefs.

Asking the Court to overlook this context, Defendants contend that O.C.G.A. § 50-5-85, (the "Anti-BDS Law"), still allows "anyone who contracts with the State [to] continue to speak out about Israel or even advocate for a boycott by others," (Dkt. 37-1, at 3). Yet the same law requires anyone doing business with the state of Georgia for an amount over $1,000 certify they do not and will not "engage in, a boycott of Israel." O.C.G.A. § 50-5-85(b).

The Anti-BDS Law is exactly the kind of majoritarian overreach the First Amendment was written to prevent.  Its certification requirement both restricts and compels speech, each of which the First Amendment expressly prohibits. This Court should deny Defendants' motion and vindicate Martin's rights.

## FACTUAL ALLEGATIONS

Georgia Southern University invited Martin to be the keynote speaker at a critical literary conference but conditioned its invitation on her agreeing in writing to abandon her First Amendment-protected journalism about and political advocacy for the rights of Palestinians, and to stop boycotting Israel. Dkt. 26, at pp. 2. Defendants conditioned Martin's invitation on her signing, rejecting, and disavowing participation in the inherently expressive activity of a boycott against Israel. *Id.*, at ¶¶ 5-8.

In 2016, Georgia's Governor enacted the Anti-BDS Law as SB 327, codified as O.C.G.A. § 50-5-85. The Anti-BDS Law forbids all state government bodies from contracting with anyone who advocates for Palestinian human rights by economically boycotting Israel, unless they agree in writing to abandon this point of view. *Id.*, at ¶¶ 28-33. The Anti-BDS Law punishes people, including Martin, by disqualifying them from entering into Georgia contracts unless they promise not to engage in expressive activity that undermines Israel's economic interests by boycotting or supporting boycotts against Israel. *Id.*, at ¶¶ 53-56. The Anti-BDS Law, along with its counterparts in 27 states, codifies a form of speaker-based discrimination and viewpoint that unlawfully restricts fundamental First Amendment rights. *Id.*, at ¶¶ 61-65, 73-76.

Martin brings claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments. *Id.*, at ¶¶ 57-86, 89-95. She is seeking injunctive

relief that would preclude Defendants from applying the Anti-BDS Law in state contracts. *Id.*, at ¶¶ 87-88, pp. 25-26. Further, Martin seeks an injunction to declare the no-boycott certification in all existing state contracts between the State and any private contractor as void, and a ruling that the Anti-BDS Law is unconstitutional. *Id.*, at pp. 25-26. Martin also seeks damages against the Individual Defendants. *Id.*

## ARGUMENT

**I.    The Anti-BDS Law is a speech and expressive conduct regulation in violation of the First Amendment.**

"Congress shall make no law … abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. Here, Georgia has passed the Anti-BDS Law, which restricts speech and inherently expressive conduct.

The law on its face, and as it is applied to Martin and others contracting with Georgia, constitutes viewpoint discrimination because it only bars speech and expression critical of Israel and its actions, and not speech or expression in favor of Israel or against Palestine. It also constitutes viewpoint discrimination because it bars the expressive conduct of boycotting Israel if that boycott conduct is done for a political reason. Yet, a refusal to do business with Israeli entities undertaken for non-expressive reasons are outside the purview of the

Anti-BDS Law. And the Anti-BDS Law also establishes content-specific restrictions on certain speech—and only speech that boycotts Israel. Government contractors that advocate for Palestine and the human rights of Palestinians by economically boycotting Israel are prohibited from contracting with Georgia or its entities. That is an impermissible State attempt to impose conditions on independent contractors that they limit their speech and protected associational activity.

It also compels speech related to a government contractors' political beliefs, associations, and expressions insofar as the Anti-BDS Law, were Martin to comply with it, would require her to stop boycotting Israel, abandon her political beliefs, and limit her advocacy, which reaches both her professional career and life as a private citizen.

To speak at the Georgia Southern University literary conference, Martin was required to sign a contract pledging that she would cease engagement in an inherently expressive activity, specifically political and economic boycotts of Israel and businesses that tacitly support its crimes against the Palestinian people. Because she refused to sign that pledge, she was not permitted to speak at the conference. Both as it is stated and how it is applied, the Anti-BDS Law bars state contractors from entering into government contracts on the basis of one viewpoint and its associated conduct.

### A.    Martin's boycott is constitutionally protected under *Claiborne*.

This case is controlled by *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), which makes clear that the Anti-BDS Law violates the First Amendment. In *Claiborne*, a group of black activists in Mississippi voted to boycott white merchants in opposition to those businesses' racist practices. 458 U.S at 889, 907. The activists then monitored their community's patronage of the stores, picketing the storefronts and urging people to shop elsewhere. *Id.* at 894, 907. As boycotts go, the one in *Claiborne* was aggressive.

The Supreme Court's decision was not ambiguous: *Claiborne* unanimously held that each peaceful "elemen[t] of the boycott is a form of speech or conduct" entitled to protection under the First Amendment. *Id.* at 907. "The black citizens … in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect." *Id.* The Defendants attempt to disaggregate the elements that form a First Amendment protected boycott to suggest that a boycott is not a protected political activity. *See, e.g.*, Dkt. 37-1 at 10. Defendants also seek to atomize the individuals who collectively take action in a boycott to suggest that an individual's peaceful withdrawal of patronage has no meaning as a First Amendment protected act unless accompanied by explanatory words from an individual to the public at a moment of consumer decision. *See, e.g.,*

*id.* at 9. This is a misreading of *Claiborne*, the nature and impact of collective expression, and how the First Amendment protects that expression.

In the last few years, three different federal courts have relied on *Claiborne* to conclude that politically-motivated boycotts of Israel are fully protected expressive activity, enjoining similar laws to the Anti-BDS Law here. "Plaintiffs' BDS boycotts are not only inherently expressive, but as a form of expression on a public issue, rest on the highest rung of the hierarchy of First Amendment values." *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 745 (W.D. Tex. 2019) (cleaned up), *vacated as moot*, 956 F.3d 816 (5th Cir. 2020). "Collective boycotting activities undertaken to achieve social, political or economic ends is conduct that is protected by the First Amendment." *Jordahl v. Brnovich,* 336 F. Supp. 3d 1016, 1041 (D. Ariz. 2018), *vacated as moot*, 789 F. App'x 589 (9th Cir. 2020). Such protests seek to band individuals together "to express, collectively, their dissatisfaction with Israel and to influence governmental action…[They] and others participating in this boycott of Israel seek to amplify their voices to influence change, as did the boycotters in *Claiborne. Koontz v. Watson,* 283 F. Supp. 3d 1007 (D. Kan. 2018). The same result from *Amawi*, *Jordahl* and *Koontz* applies here.[1]

---

[1] A third district court case, *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d. 617 (E.D. Ark. 2019) (on appeal), upheld an Anti-BDS Law, but that case was wrongly decided for the reasons explained in Section E, below.

### B.   *Claiborne*, not *FAIR*, applies.

As explained by the District Courts in *Amawi, Jordahl*, and *Koontz*, the First Amendment issues presented in this case are controlled by the ruling in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and not *Rumsfeld v. FAIR*, 547 U.S. 47 (2006).

As the District Court in *Amawi* correctly explained, "*Claiborne* deals with political boycotts; *FAIR*, in contrast, is not about boycotts at all." 373 F. Supp. 3d at 743. In *FAIR*, "[t]he Supreme Court did not treat the FAIR plaintiffs' conduct as a boycott: the word 'boycott' appears nowhere in the opinion, the decision to withhold patronage is not implicated, and *Claiborne*, the key decision recognizing that the First Amendment protects political boycotts, is not discussed." *Id.* (footnote omitted).

Also, in *FAIR*, "'[t]he conduct regulated by the Solomon Amendment,' the Court held, 'is not inherently expressive' because it requires 'explanatory speech' to communicate its message." *Id.* In *FAIR*, the Government did not care why it was not being granted access to on-campus student interviews. 546 U.S. at 57 ("The Solomon Amendment does not focus on the content of a school's recruiting policy" but instead "looks to the result achieved by the policy and compares the 'access ... provided' military recruiters to that provided other recruiters"). Here, the Anti-BDS Law only cares about "refusals to deal with, terminating business activities with, or other actions that are intended to limit

8

commercial relations with Israel" when the reason is because of a "boycott of Israel" (or some "[non-]valid business reason"). O.C.G.A. § 50-5-85(a). In order to impose Georgia's viewpoint on Israel, Georgia requires certification creating the very speech that was absent and detached from *FAIR* as a necessary part of the Court's conclusion. *Compare* O.C.G.A. § 50-5-85(b) (requiring certification) *with FAIR*, 547 U.S. at 66 (refusal to provide military recruiters access was "expressive only because the law schools accompanied their conduct with speech explaining it"); *see Jordahl*, 336 F. Supp. 3d at 1042 ("when a statute requires a company, in exchange for a government contract, to promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes, the state is infringing on the very kind of expressive conduct at issue in *Claiborne*.").

*FAIR* omits *Claiborne*, along with other important First Amendment cases like *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 415-16 (1990) and *International Longshoreman's Association v. Allied International, Inc.*, 456 U.S. 212 (1982). When the Supreme Court overrules or distinguishes prior decisions, it does so expressly. That is not what the Supreme Court did here, and its unanimous, narrow decision in *FAIR* cannot be read to have abrogated decades of prior boycott-specific law covertly and sans dissent.

Defendants argue that *Claiborne* distinguished between protected messaging and an unprotected boycott. Dkt. 37-1 at 9-10 and 15-17. *Claiborne*

rejected this argument explicitly, and instead held that the Government was prohibited from punishing the boycott alone. 458 U.S. at 911 (the "boycott clearly involved constitutionally protected activity," and its speech elements, "though not identical, are inseparable"); *see also Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) ("the circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not") (holding that feeding homeless as part of political movement was constitutionally-protected expressive activity) (cited by Georgia, Dkt. 37-1 at 9-10).

To this end, *Claiborne* controls over *Longshoreman* as well. As explained by *Claiborne* itself, *Longshoreman* is cabined to the labor space because it held that a government may bar secondary boycotts "by labor unions . . . as part of Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." 458 U.S. at 912 (cleaned up). No such delicate balance is created by the Anti-BDS Law here.

### C. The text of Georgia's Anti-BDS Law makes clear that speech is a necessary component of the conduct it prohibits.

All anti-BDS laws are unconstitutional, but Georgia's Anti-BDS Law appears almost to have been drafted to make it clear that it is unconstitutional. The law, in its definition of "Boycott of Israel," makes two separate defined

10

actions illegal. The language of both prove the Anti-BDS Law's unconstitution-ality.

*First*, "refusals to deal with, terminating business activities with, or other actions that are intended to limit commercial relations with Israel or individuals or companies doing business in Israel or in Israeli-controlled territories, when such actions are taken [i]n compliance or adherence to calls for a boycott of Israel," is illegal. In other words, a refusal to deal or other conduct is illegal, but ***only*** when it is specifically part of a larger call to action. This is the inverse of *FAIR*. *See* Section B, above.

*Second*, "refusals to deal" and similar conduct violate the Anti-BDS Law "when such actions are taken … [i]n a manner that discriminates on the basis of nationality, national origin, religion, or other unreasonable basis that is not founded on a valid business reason." But what is a valid business reason? The law is silent. Is a decision not to engage in business because one finds it unethical a "valid business reason"? Then Martin's conduct satisfies the exception. Or does it only apply when the decision not to engage is profit maximizing? And if so, is it only when the Israeli company is directly more expensive to do business with, or does that include the possible loss in revenue from being

targeted by BDS secondary boycotts?[2] Further illustrating the intentional attack on speech and expression rather than conduct, Georgia suggests that "valid business reason" means reasons other than a "boycott." Dkt. 37-1 at 22 n.9.

For these reasons, the law is both vague and overbroad as explained in Sections III-IV below. But it is not a mere coincidence that every anti-BDS law suffers from vagueness and overbreadth. *See, e.g., Amawi*, 373 F. Supp. 3d at 752, 755-58. It again is a result of the core conduct that these states want to punish. Georgia only wants to punish actions when they are inextricably intertwined with speech that these states want to silence. It is for this reason that Georgia requires a certification that no advocate of a boycott of Israel could possibly sign. *Amawi*, 373 F. Supp. 3d at 754-55; *Jordahl*, 336 F. Supp. 3d at 1032-33; *Koontz*, 283 F. Supp. 3d at 1024; *see also* Section II, below.

It is for these reasons, despite Georgia attempting to argue otherwise (*e.g.,* at 26), that *Claiborne* said that the speech and non-speech elements of a

---

[2] This is not a mere hypothetical. Texas has applied its anti-BDS law to Airbnb, who refused to list properties in certain Israeli-controlled territories in the West Bank. Airbnb may have been doing so to comply with another government entity's legal requirements, because the refusal is part of a broader anti-discrimination policy, or in order to avoid international commercial boycotts of Airbnb by third parties. Indeed, in announcing its refusal to list properties, Airbnb stated "Airbnb does not support the BDS movement, any boycott of Israel, or any boycott of Israeli companies." Although Airbnb relented without a legal challenge, the situation illustrates the vagueness issues. *See generally* Elizabeth Findell, *In pro-Israel move, Texas books boycott of Airbnb*, AUSTIN AMERICAN STATESMAN (Mar. 11, 2019), available at https://www.statesman.com/news/20190311/in-pro-israel-move-texas-books-boycott-of-airbnb; Amanda McCaffrey, *Airbnb's Listings in Disputed Territories: A Tortured Compromise*, Just Security (July 29, 2019), available at https://www.justsecurity.org/65114/airbnbs-listings-in-disputed-territories-a-tortured-compromise; Elizabeth Findell, *Airbnb reverses policy that landed it on Texas' anti-Israel list*, AUSTIN-AMERICAN STATESMAN (Apr. 9, 2019), available at https://www.statesman.com/news/20190409/airbnb-reverses-policy-that-landed-it-on-texas-anti-israel-list.

boycott "though not identical, are inseparable," and therefore governments cannot punish participation in a boycott. 458 U.S. at 911; *see also R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 388 (1992) (government cannot prohibit unprotected conduct if it only does so on the basis of protected speech or viewpoints).

The Georgia statute, in particular, could not make this any clearer. Although it defines the term "boycott," it describes the certification requirement as "a written certification that such individual or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel." It uses the term boycott instead of a mere "refusal" or other language because the law targets the boycott itself, and not a mere decision not to purchase some good or service. As the elements of the boycott are inseparable, Georgia knows a certification requirement targeting any element of the boycott will prohibit all of the elements of the boycott. And Georgia knows that anyone engaged in BDS boycotts cannot sign the certification in question. Georgia barely deigns to hide its goal of restricting political speech.

### D. The Anti-BDS Law burdens speech and does not further a substantial state interest.

The Anti-BDS Law targets specific content and one viewpoint. Whether contractors may participate in political boycotts about the Middle East depends entirely upon whether their boycott is critical of Israel, as opposed to any other

government, company, or cause. Martin remains free, for example, to economically boycott Palestine. She is also free to economically boycott Saudi Arabia and Iraq. She also remains free to boycott any domestic state, company, or cause (so long as it is not part of a larger boycott of Israel). The Anti-BDS Law only targets anti-Israel boycotts, which makes the Anti-BDS Law impermissibly content-based. *See Boos v. Barry,* 485 U.S. 312, 319 (1988) ("Whether individuals may picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not.").

In general, content-neutral antidiscrimination laws may incidentally regulate expressive conduct because they are narrowly tailored to serve a compelling state interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984); *but see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (even neutral antidiscrimination law may not prohibit certain expressive conduct). To be tailored to meet a compelling state interest, the antidiscrimination law must "not aim at the suppression of speech, [must] not distinguish between prohibited and permitted activity on the basis of viewpoint, and [must] not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Jaycees*, 468 U.S. at 623.

Because the Anti-BDS Law "distinguish[es] between prohibited and permitted activity on the basis of viewpoint," it fails muster under *Jaycees*. *See Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281, 288 (D. Md. 1988)

14

(anti-discrimination law was neither "content-neutral" nor narrowly-tailored); *Bd. of Ancient Order of Hibernians v. Dinkins,* 814 F. Supp. 358, 368 (S.D.N.Y. 1993) (similar); *see R.A.V.,* 505 U.S. at 395 (existence of content-neutral alternatives "undercuts significantly" the constitutional viability of a statute).

Georgia's claim that the Anti-BDS Law is "neutral" because "[i]t applies to refusals to deal with Israel-related entities regardless of the viewpoint motivating the boycott," Dkt. 37-1 at 22, is a legal fiction—it is simply not congruent with the First Amendment meaning of "neutral." And, in any event, it fails the straight-face test. Georgia's Anti-BDS Law targets the BDS movement over the occupation, rather than boycotts of Israel because of, say, a disagreement with countries who have white and blue flags.

Likewise, Georgia's argument (at 21-24) that the law is subject to and survives intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) does not hold water. *O'Brien* requires Georgia show, among other things, that "the governmental interest is unrelated to the suppression of free expression." 391 U.S. at 377. As explained in particular in Section C above, the suppression of free expression is the only purpose of the Anti-BDS Law. *See Koontz*, 283 F. Supp. 3d at 1023 ("conduct the Kansas Law aims to regulate is inherently expressive," under *Claiborne*).

Georgia's reliance on *FAIR* in making its *O'Brien* argument is inappropriate as explained above in Section B. *FAIR* was a decision on very narrowly-

defined conduct—that a law school must provide physical access for military recruiters. 547 U.S. at 58. Once a law school facilitated that access, "[t]he Solomon Amendment [would] neither limit what law schools may say nor require them to say anything." *Id*. at 60. The Supreme Court specifically acknowledged that law schools remained free to engage in other protest activities, including distributing dissenting bulletins or protesting outside the military recruiters' doors. And the Supreme Court in *FAIR* averted any legal dissection of the school's speech or viewpoints on LGBT discrimination in the military. *FAIR*, as limited to narrow conduct, involved an "incidental" burden on speech, which triggers at most intermediate scrutiny. 547 U.S. at 67 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Under the test relied on by *FAIR*, an incidental burden on speech will be upheld if "the governmental interest is unrelated to the suppression of free expression," *see O'Brien*, 391 U.S. 367; *FAIR*, 547 U.S. at 65-67. The Georgia statute creates an entirely different situation.

In fact, Georgia's interest—stated as effectuating U.S. foreign policy goals—is in itself suppressing speech against Israel and conduct associated with boycotting as a form of expression. The Anti-BDS Law is not content-neutral, nor is it viewpoint-neutral. It aims to prohibit expressive speech criticizing Israel as a prerequisite to contracting with Georgia. And so, Georgia's speech restriction is anything but incidental.

16

### E. *Arkansas Times* was wrongly decided.

*Arkansas Times* is wrongly decided for the same reasons that *Longshore-men* and *FAIR* should be rejected. *Arkansas Times* reaches its primary holding that an anti-Israel-boycott prohibition does not regulate expressive conduct by distinguishing speech in support of a boycott (which *Arkansas Times* claims is protected) from the act of boycotting itself (which *Arkansas Times* claims is not). *Claiborne* specifically rejects this distinction.

What is more, *Arkansas Times*'s reliance on *FAIR* is problematic because it argues that "[i]t is highly unlikely that, absent any explanatory speech, an external observer would ever notice that a contractor is engaging in a primary or secondary boycott of Israel." 362 F. Supp. 3d at 624. In this case, the speech is compelled by the Anti-BDS Law itself and embodied in the "No Boycott of Israel" certification requirement. *See Jordahl*, 336 F. Supp. 3d at 1042 (requiring a "promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes" is "infringing on the very kind of expressive conduct at issue in *Claiborne*").

### F. *Longshoreman* and *Briggs* do not apply.

Georgia also seeks refuge from the First Amendment in *Longshoreman* and *Briggs*. *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984). But, as explained by *Claiborne* itself, *Longshoreman* is cabined to the labor context, holding that a government may bar secondary boycotts "by labor

17

unions . . . as part of Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." 458 U.S. at 912 (internal quotation marks and citation omitted). And "*Briggs* is even less relevant." *Amawi*, 373 F. Supp. 3d at 746. *Briggs* "did not involve a law allegedly infringing the right to boycott, and the speech allegedly infringed was not political speech." *Id.*

According to Georgia, the NAACP and their members in *Claiborne* could advocate for a boycott of white merchants, but they had no right to refuse to visit their stores or purchase their merchandise. 458 U.S. at 900, 911; *see* Dkt. 37-1 at 15-17. And so, according to Oklahoma, Mississippi, and Claiborne County could have required the NAACP's members to certify that they would not boycott racially discriminatory businesses. *But see Koontz*, 283 F. Supp. 3d at 1024 ("Forcing plaintiff to disown her boycott is akin to forcing plaintiff to accommodate Kansas's message of support for Israel"). Since any result blocking that NAACP activism would be wrong under *Claiborne* itself, Texas must be wrong as well.

## II.    The Anti-BDS Law is unconstitutional compelled speech.

"The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster … an idea they find morally objectionable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

The Anti-BDS Law unconstitutionally compels Martin and others and to certify that they will not boycott Israel. This loyalty oath to Israel specifically violates what the Supreme Court has called a "fixed star in our constitutional constellation." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It does so by "prescrib[ing] what shall be orthodox in politics" and forcing Martin to sign a loyalty oath compelling her "to confess by word or act [her] faith" in that pro-Israel orthodoxy. *See id.*

The government is constitutionally prohibited from requiring contractors to pledge allegiance to its preferred policies. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220–21 (2013). State governments cannot condition employment "on an oath that one has not engaged, or will not engage, in protected speech activities." *Cole v. Richardson*, 405 U.S. 676, 680 (1972) (collecting cases). Even if *FAIR* could otherwise justify the Anti-BDS Law because it prohibits conduct that lacks a speech component, *see* Section I(B), above, the Anti-BDS Law separately requires that speech component from Ali and others. The result compels the very speech that reveals the Governor's viewpoint-based ban on expressive conduct and makes the Executive Order unconstitutional.

Georgia makes three arguments (at 13-14) why the Anti-BDS Law does not unconstitutionally compel speech. Georgia's first argument is that the certification that Martin will not "boycott Israel" is permissible because it only

19

relates to unprotected conduct. That is wrong for the reasons explained above in Section I, as well as in *Koontz*. 283 F. Supp. 3d at 1024 ("Forcing plaintiff to disown her boycott is akin to forcing plaintiff to accommodate Kansas's message of support for Israel"). Georgia's second argument is that compelled speech is okay when made a condition of a government contract. This is wrong as explained in *Open Society*, 570 U.S. at 220–21, and Section V, below. And the third is that a similar speech restriction was permitted in *FAIR*. This is false. The only compelled speech at issue in *FAIR* was "compelled statements of fact" where "schools may send e-mails or post notices on bulletin boards on an employer's behalf" such as "[t]he U.S. Army recruiter will meet interested students in Room 123 at 11 a.m." 547 U.S. at 61-62. No certification was required—indeed, the lack of any accompanying speech about permitting or not permitting government recruiters was essential to the Court's holding. *See* § I(B), above; *see also FAIR*, 547 U.S. at 56 (Solomon Amendment "does not call for an inquiry into why").

## III.   The Anti-BDS Law is unconstitutionally vague

Laws are unconstitutionally vague where "[someone] of common intelligence must necessarily guess at [their] meaning." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in

other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also NAACP v. Button*, 371 U.S. 415, 432 (1963) ("standards of permissible statutory vagueness are strict in the area of free expression").

The Anti-BDS Law defines a "boycott of Israel" as "engaging in refusals to deal with, terminating business activities with, or other actions that are intended to limit commercial relations with Israel or individuals or companies doing business in Israel or in Israeli-controlled territories, when such actions are taken…in compliance or adherence to calls for a boycott of Israel…[or] in a manner that discriminates on the basis of nationality, national origin, religion, or other unreasonable basis that is not founded on a valid business reason." O.C.G.A. § 50-5-85(a).

Several of these clauses are impossibly vague.

***First***, the "other actions that are intended to limit commercial relations with Israel" provision is impermissibly vague. As explained by the Court in *Amawi* striking a similar provision, "For example, donating to a Palestinian organization, purchasing art at a Gaza liberation fair, donating to an organization like Jewish Voice for Peace that organizes BDS campaigns, or picketing outside Best Buy to urge shoppers not to buy HP products because of the company's relationship with the IDF—all these activities may be seen as 'taking any action that is intended to penalize, inflict harm on, or limit commercial relations specifically with Israel,' though none would typically be considered a

'boycott.'" 373 F. Supp. 3d at 756 (striking down Texas's anti-BDS law as impermissibly vague). So too here.

*Second*, the "other unreasonable basis" provision is also impermissibly vague. What is "unreasonable" is not defined by the law in any way and thus the law attempts to penalize "unreasonable" conduct. This has long been established as impermissible. Prohibiting "unreasonable" conduct "leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. *U.S. v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).

*Third*, "valid business reason" carve-out is even more vague than the similar "ordinary business purposes" carve-out struck down in *Amawi*. Given the vagueness of the carve-out provision, "[t]he statute offers no guidance to those who must enforce it or those who must comply with its dictates" as to what reasons are appropriate for declining to enter into any transaction with almost any company. 373 F. Supp. 3d at. at 757.

Georgia (at 31-32) defends the Anti-BDS Law's vagueness by relying on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982), which states that certain statutes may only be deemed vague when the "enactment is impermissibly vague in all of its applications." But, in a footnote to that statement, the Supreme Court indicated that this only applies to "vagueness challenges to statutes which do not involve First

Amendment freedoms." *Id.* at 495 n.7. Georgia implies (at 37) that the Eleventh Circuit has extended *Hoffman Estates* to the First amendment context anyway in *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164 (11th Cir. 2018), but the Court in *Stardust* merely found the First Amendment connection too "trivial" and focused solely on due process, not First Amendment, vagueness. Georgia itself requires resorting to ephemeral canons of construction when interpreting the statute. Dkt. 37-1 at 11-12 (asking the Court to interpret the statute narrowly in order to avoid First Amendment problems); *see Virginia v. American Booksellers Association,* 484 U.S. 383, 397 (1988) (court should "not rewrite a state law to conform it to constitutional requirements"); *U.S. v. Natl. Dairy Products Corp.*, 372 U.S. 29, 36 (1963) (explaining that canon of construction to avoid constitutional concerns is limited in the First Amendment context "because such vagueness may in itself deter constitutionally protected and socially desirable conduct").

Otherwise, Georgia's defense of the statute yet again only further highlights its unconstitutionality. Georgia says (at 33) the law applies to a decision to limit one's "***commercial conduct*** with Israel or Israel-related businesses" when that limiting is done as part of a "boycott" as that term is commonly understood. That is not what the Anti-BDS Law says.

And even if Georgia were right that this was what the law does, it would be unconstitutional because it would define impermissible conduct purely by

the speech that accompanied the conduct. Under Georgia's limited interpretation of the law, the law still specifically targets conduct only when it is a form of political expression protected by the First Amendment, and will not prohibit the exact same conduct so long as it is not intended to express or amplify a message, work in collective First Amendment associational action, or seek a political change. The exact same underlying activity identified in the statute is allowed so long as it is devoid of political expression and intent. Thus, the statute discriminates between identical conduct based on the intent and viewpoint of the individual or company. *See* § I(B), above (explaining why *Claiborne* and not *FAIR* applies); *see also R.A.V.*, 505 U.S. at 388 (government cannot prohibit unprotected conduct if it only does so on the basis of protected speech or viewpoints).

And thus, it readily extends to any activity done in response to the Boycott, Divestment, and Sanctions movement. The vagueness of the statute and its "Boycott of Israel" definition operates to chills free speech, expression, and association.

But the law on its face does more. The law does not apply to mere actions that themselves limit commercial contract because, on its face, it also applies to "other actions that are intended to limit commercial relations with Israel," which is not on its face limited to commercial activity itself. This is especially so when the law restricts actions intending to "limit commercial relations with

Israel," as opposed to any particularly defined company, corporation, or group of companies or corporations. And the law does not apply just to actions taken in compliance with a call to boycott Israel, as it is applied to other discriminatory or "unreasonable" conduct, whatever that means, unless there is a "valid business reason," whatever that means.

At the end of the day, the statute does not provide any guidance other than stating that it is improper to take some unspecified actions against some unspecified companies, but only when those actions are taken as part of a constitutionally-protected boycott or when they are "unreasonable" and not for a "valid business reason." This is too vague and too broad to withstand constitutional scrutiny.

## IV.   The Anti-BDS Law is overbroad.

Even if the Anti-BDS Law was not unconstitutionally vague, and even if it were permissible to segregate and punish non-purchasing as part of a boycott from the greater boycott itself, the boycott is overbroad and targets protected forms of conduct such as association, soliciting, picketing, and other forms of advocacy.

A law "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *U.S. v. Stevens*, 130 S. Ct. 1577, 1588 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U. S. 442, 449,

25

n. 6 (2008). When a statute raising First Amendment concerns is overbroad, a plaintiff may challenge it, "'not because [plaintiff's] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). The doctrine is closely related to vagueness doctrine. *Hoffman Estates*, 455 U.S. at 494.

In determining whether a statute is overbroad and thus facially invalid, courts must determine whether it "prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The determination involves "[striking] a balance between competing social costs." *Id.* (*citing Virginia v. Hicks*, 539 U.S. 113, 119–120 (2003)). It would obviously be harmful if a statute that was constitutional in some of its applications was struck down, but that is not the case here. Instead, the social cost and threat posed by the enforcement of O.C.G.A. § 50-5-85 "deters people from engaging in constitutionally protected speech" and inhibits "the free exchange of ideas." *Id.*

The "other actions that are intended to limit commercial relations with Israel" provision is overbroad for much the same reasons it is vague. As *Amawi* noted, the language would cover protected conduct ranging from "donating to a Palestinian organization, purchasing art at a Gaza liberation fair, donating to an organization like Jewish Voice for Peace that organizes BDS campaigns,

or picketing outside Best Buy to urge shoppers not to buy HP products because of the company's relationship with the IDF." 373 F. Supp. 3d at 756 (striking down Texas's anti-BDS law as impermissibly vague). Indeed, "other actions" is open-ended, limited only by the imagination of the state. This is not the "requisite narrow specificity" required by First Amendment overbreadth doctrine. *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). And while Georgia attempts to limit the meaning of the statute, overbreadth doctrine, by its very nature "cannot be avoided by a narrowing construction." *Hill v. Houston,* 764 F.2d 1156, 1165 (5th Cir. 1985).

For the same reason, "other unreasonable basis" is likewise overbroad. Nor can it be saved by the inherently vague carve-out for "valid business reasons." *See also* Section III, above.

## V.     Georgia cannot impose unconstitutional conditions on contracts.

The government is constitutionally prohibited from requiring contractors to pledge allegiance to its preferred policies. *Open Society*, 570 U.S. at 220-21. State governments cannot condition contracting with the Government "on an oath that one has not engaged, or will not engage, in protected speech activities." *Cole v. Richardson*, 405 U.S. 676, 680 (1972) (collecting cases).

Georgia claims the First Amendment does not apply to the Government "subsidizing" individuals when it acts as a proprietor rather than a regulator,

where the Government has "greater leeway" in contracting. Dkt. 37-1 at 28. The Supreme Court rejected that argument in *Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996). *Umbehr* held that the First Amendment applies in full to government contracting decisions, with the only distinction being that courts may consider the Government's particular proprietary "interests" in performing the relevant balancing test. *Id.* at 678-79.

Most of the Georgia's cases are about subsidies, not contracts. Georgia's only case that is about Government contracting is *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996), decided on the same day as *Umbehr*. That case does state that, in many respects, "[t]he Constitution accords government officials a large measure of freedom as they exercise the discretion inherent in making those decisions." (Dkt. 37-1 at 27-28 (quoting *O'Hare*, 518 U.S. at 724-25). But, had Georgia read the whole opinion, it would have found that the discretion does not generally apply in the First Amendment context, as "it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views." *Id.* at 725-26. So, the Court in *O'Hare* "decline[d] to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees." *Id.* So too here.

Georgia complains (at 29) that "the leeway accorded states when acting as contractors (and not as pure regulators) should be at least as broad as that

28

of the federal government exercising its spending power through legislation."
The Supreme Court has found the opposite in *Umbehr. See Wabaunsee County
v. Umbehr,* 518 U.S. 668 (1996). While the Supreme Court's balancing makes
more sense than Georgia's anyway—there is a far greater concern on chilling
speech when the Government prohibits individuals for competing on generally-
available contracts and benefits than when it merely decides to subsidize one
message over an other—it would control even if it were less persuasive.

Finally, even if the Court ignored the government contracting cases and
applied general spending cases such as *Rust v. Sullivan*, 500 U.S. 173 (1991),
*see* Dkt. 37-1 at 29, it would make no difference. *Jordahl*, 336 F. Supp.3d at
1046 n.9. This is because those cases themselves make a distinction between
the government funding specific activity that constitutes speech, which is per-
mitted, and the government declining to subsidizing entities because of other
speech, which remains unconstitutional. *See Open Society*, 570 U.S. at 206
("The distinction that has emerged from this Court's cases is between condi-
tions that define the limits of the Government spending program—those that
specify the activities Congress wants to subsidize—and conditions that seek to
leverage funding to regulate speech outside the contours of the federal program
itself."). Because the Anti-BDS Law prohibits Martin from boycotting Israel
even outside the government contract, the latter rule controls, and the Anti-
BDS Law is unconstitutional.

**VI.      The First Amendment violation is clearly established.**

The Individual Defendants are not entitled to qualified immunity. Georgia claims qualified immunity only on the basis that any constitutional violation was not of a clearly established right.[3] But *Claiborne* clearly establishes that the Government may not prohibit "nonviolent, politically motivated boycott designed to force governmental and economic change." 458 U.S. at 914; *see also Fla. Gulf Coast Bldg. and Const. Trades Council v. N.L.R.B.*, 796 F.2d 1328, 1332 (11th Cir. 1986) (*Claiborne* "held that the First Amendment protects a secondary boycott organized by a civil rights group"), *aff'd sub nom. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568 (1988); *Ray v. Edwards*, 725 F.2d 655, 660 (11th Cir. 1984) ("the Supreme Court held that the boycott was political activity, protected by the first amendment"); *F.T.C. v. Super. Ct. Tr. Lawyers Ass'n*, 493 U.S. 411, 449 (1990) (Brennan, J., concurring in part) (describing *Claiborne* as holding "that a civil rights boycott was political expression"). And *FAIR*, which does not mention *Claiborne* at all, did nothing to un-establish *Claiborne*.

"[A]n exact factual analogue does not have to exist for a defendant to be on notice." *Allred v. City of Carbon Hill, Ala.*, 13-cv-00930, 2014 WL 5426822, at *9 (N.D. Ala. Oct. 24, 2014). "Rather, the applicable standard is whether 'a

---

[3] Plaintiffs reserve the right to challenge on appeal whether qualified immunity is appropriate even were the violation not clearly established. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1869-72 (2017) (Thomas, J., concurring in part) (criticizing qualified immunity).

reasonable person in the position of the defendant would know he is violating clearly established law.'" *Id.* (quoting *Hansen v. Soldenwagner*, 19 F.3d 573, 578 (11th Cir. 1994)). To satisfy that standard, "preexisting case law, tied to the precise facts, is not in every situation essential." *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002).

Georgia's law strikes at that very heart of the First Amendment. It defines the conduct it punishes in terms of disfavored speech. It openly describes itself as a law prohibiting political boycotts. That this is unconstitutional has been clearly established.

## CONCLUSION

For the reasons stated, Plaintiff respectfully requests the Court deny Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.

Dated: October 7, 2020                  Respectfully,

                                        /s/ Lena F. Masri
                                        BY: LENA F. MASRI

                                        CAIR-GEORGIA
                                        Murtaza Khwaja (Ga. Bar # 750003)
                                         mkhawaja@cair.com
                                        PO Box 942134
                                        Atlanta, GA 30341
                                        Phone: (404) 419-6390

                                        CAIR LEGAL DEFENSE FUND
                                        Lena F. Masri (D.C. # 9777642) ^
                                         lmasri@cair.com
                                        Gadeir I. Abbas (VA # 81161) *^
                                         gabbas@cair.com
                                        Justin Sadowsky (D.C. # 1000019) ^
                                         jsadowsky@cair.com

                                        453 New Jersey Ave., S.E.
                                        Washington, D.C. 20003
                                        Phone: (202) 742-6420

                                        32

Fax: (202) 488-0833

PARTNERSHIP FOR CIVIL JUS-TICE
FUND
Mara Verheyden-Hilliard
(D.C. # 450031) ^
  mvh@justiceonline.org

617 Florida Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 232-1180
Fax: (202) 747-7747

^ *admitted pro hac vice*
* *Licensed in VA, not in D.C.*
*Practice limited to federal matters.*
*Counsel for Plaintiff Abby Martin*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing **BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** has been prepared in compliance with Local Rule 5.1(B) in 13-point Century Schoolbook typeface.

Dated: October 7, 2020          /s/ Lena F. Masri
                                BY: LENA F. MASRI

                                CAIR LEGAL DEFENSE FUND
                                Lena F. Masri (DC # 9777642) ^
                                  lmasri@cair.com
                                Gadeir I. Abbas (VA # 81161) *^
                                  gabbas@cair.com
                                Justin Sadowsky (DC # 1000019) ^
                                  jsadowsky@cair.com

                                453 New Jersey Ave. SE
                                Washington, DC 20003
                                (202) 742-6420

                                ^ *admitted pro hac vice*

33

*\* Licensed in VA, not in D.C.*
*Practice limited to federal matters.*

Counsel for Plaintiff Abby Martin