## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ABBY MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:20-cv-00596-MHC |
| | ) | |
| STEVE WRIGLEY, Chancellor for the | ) | |
| Board of Regents of the University System | ) | |
| of Georgia, in his official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Martin's opposition relies heavily on the assumption that O.C.G.A. § 50-5-85 regulates a significant amount of activity that it does not. The statute does not implicate contractors' ability to call on others to support the BDS movement or to oppose Israel through movies, speeches, or other inherently expressive conduct. Nor does it "coerce" contractors into "abandoning" or "disavowing" political beliefs, or compel them to convey any message or viewpoint. And, despite Martin's statement to the contrary, her invitation to speak at GSU was not conditioned upon her agreeing to abandon her journalism, her political advocacy for the rights of Palestinians, her criticism of Israel, or upon her willingness to give up any activity protected by the First Amendment. That is because § 50-5-85 leaves state contractors free to say what they want and regulates only conduct – the actual refusal to do business with Israel. Because a refusal to do business, even when

1

politically motivated and part of a broader political movement, is not inherently expressive conduct protected by the First Amendment, Martin's claims fail.

**I.**  *Rumsfeld v. FAIR* **rejected a claimed First Amendment right to refuse to deal**.

In *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), the Supreme Court rejected the argument that a law school has a First Amendment right to refuse to allow military recruiters on its property, even though the refusal was part of a concerted effort to express disapproval of military policy. The refusal to deal with military recruiters was, the Court held, expressive only when accompanied by speech; thus, it was not "inherently expressive conduct" for First Amendment purposes. As shown in Defendants' initial brief, this analysis is controlling here. Martin's attempt to show otherwise fails.

Martin first argues that *FAIR* is inapplicable because it did not involve a boycott, reasoning that, if it did, the Court would have used the word "boycott" and would have expressly overruled or distinguished *Claiborne*. This is not so. First, a concerted refusal to deal with a certain group of people (i.e., military recruiters) based on an objection to their policies (i.e., the military's "Don't Ask, Don't Tell" policy) is a classic boycott.[1] That is exactly what was at issue in *FAIR,* and it is what is at issue here. Second, as far as *FAIR*'s failure to discuss *Claiborne*, there was simply no reason or need to do so. The issue in *FAIR* was not whether the speech that often accompanies a political boycott (e.g., assembling with like-minded people, picketing, urging others to join the cause) was

---

[1] Thus, as Defendants point out in their opening brief, the law schools themselves, as well as amici curiae, used the term boycott to describe the law schools' conduct in their briefing. *See* Brief for Respondents, *FAIR*, 547 U.S. 47 (2006), 2005 U.S. S.Ct. Briefs LEXIS 6342005, *55; Brief for Ass'n of Am. Law Schools as Amicus Curiae in Support of Respondents, *FAIR*, 547 U.S. 47, 2005 U.S. S.Ct. Briefs LEXIS 637, *44.

protected by the First Amendment, but whether such protection extended to the refusal to deal with military recruiters. While *Claiborne* addressed the former issue, it had no occasion to, and did not, address the latter.

Martin next argues that *FAIR* is distinguishable because the Solomon Amendment is unconcerned with the reason a law school denies equal access to military recruiters, whereas § 50-5-85 concerns itself only with "boycotts of Israel." *See* Doc. 43 at 12-13, 15. Her comparison is off the mark. Targeting only boycotts of Israel is no different than the Solomon Amendment targeting only boycotts of military recruiters. And just as the Solomon Amendment is unconcerned with the reason a law school refuses to deal with military recruiters, § 50-5-85 is unconcerned with the viewpoint or motivation behind a contractor's refusal to deal with Israel. To be sure, § 50-5-85's definition of "boycott" does not include refusals to deal based on valid business reasons. But such conduct is not, by any definition, a boycott, and it necessarily does not involve discriminatory decision making. Martin provides no authority for her suggestion that § 50-5-85 must also preclude contractors from refusing to deal based on valid business reasons in order to pass constitutional muster.[2]

Finally, Martin argues that *FAIR* is distinguishable because the Solomon Amendment did not require law schools to certify in writing that they were not refusing to

---

[2] Such a requirement would call into question state and federal laws which regulate discriminatory and anti-competitive conduct but exclude from their purview conduct based on valid business reasons. *See, e.g.*, Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*); *Tyntec Inc. v. Syniverse Techs., LLC*, 2019 U.S. Dist. LEXIS 231273, *37 (M.D. Fla. Aug. 19, 2019) ("Even assuming Tyntec could establish Syniverse's refusal to deal … the [antitrust] claim will still fail if Syniverse had a valid business justification").

deal with military recruiters. But *FAIR*'s holding that the government can constitutionally deny funding to law schools that refuse to deal with military recruiters because such refusals are not inherently expressive is in no way based on the presence or absence of a certification requirement. And the holding is on all fours with the situation here – Martin's personal purchasing choices, whether it be purchasing one brand of hummus over another or simply not purchasing a particular item at all, are expressive only to the extent she explains to an observer why she is making them. Section 50-5-85's certification requirement does not change this. *FAIR* governs here.[3]

## II. *NAACP v. Claiborne* protects speech advocating boycotts; it does not hold that a politically motivated refusal to deal is protected by the First Amendment.

As anticipated, Martin contends that *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), establishes an unfettered First Amendment right to engage in politically motivated consumer boycotts and that it, not *FAIR*, controls. As discussed at length in Defendants' initial brief, it does not. Martin fails to show otherwise.

Martin begins by disputing that *Claiborne* failed to include in its description of the protected elements of a boycott the participants' refusal to deal with white merchants. She

---

[3] Martin also attempts to dismiss the relevance of *Int'l Longshoremen's Assoc. v. Allied Int'l, Inc.*, 456 U.S. 212 (1982), contending that it is limited to the labor context. But *Longshoremen's* did not recognize a First Amendment interest in secondary boycotts and then conclude that governmental infringement of that interest was justified by the government's unique interest in regulating labor law. Indeed, *Longshoremen*'s analysis is dismissive of the idea that any First Amendment interest existed at all, *see id.* at 226–27 (observing no "protected activity under the First Amendment"), a conclusion underscored by the absence of any discussion of compelling state interests or narrow tailoring. As far as Martin's related contention that *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984), is "even less relevant," Defendants do not rely on *Briggs* as Martin suggests.

argues that this is a misreading of *Claiborne* and, in particular, that *Claiborne* itself explicitly rejected the idea that the elements of a politically motivated boycott, including the underlying refusal to deal, can be "disaggregated" from each other. But in fact *Claiborne* did just that. The Court observed that "[t]he boycott of white merchants at issue in this case took many forms" – such as "marches," "meeting[s]," "threats of social ostracism," "speeches and nonviolent picketing," and urging others "to join the common cause" – and observed that "*[e]ach of these elements* of the boycott is a form of speech or conduct" protected by the First Amendment. *Id.* at 907 (emphasis added). The Court did not hold that the boycott *was* protected activity, but that it "clearly *involved* constitutionally protected activity," and it identified the protected elements of the boycott as "speech, assembly, association, and petition." *Id.* at 911 (emphasis added). Notably absent from its list is the participants' refusal to deal commercially with white-owned businesses – an element *Claiborne* had no occasion to address, because Mississippi law did not prohibit such private commercial choices. *Id.* at 891, n. 7, 894, 915.

Martin next points out that district courts outside of this circuit have interpreted *Claiborne* in the manner she advances and urges this Court to do the same. Defendants discuss these cases in their initial brief, showing that each relies on an incorrect reading of *Claiborne* and cannot be squared with *FAIR*. *See* Doc. 37-1 at 19-20. The better reasoning, and the reasoning Defendants urge this Court to follow, is that of the district court in *Ark. Times LP v. Waldrip*, 362 F. Supp. 3d. 617 (E.D. Ark. 2019) (on appeal), which correctly recognizes that *Claiborne* did not reach, or have occasion to reach, the issue of whether politically motivated refusals to do business with someone are constitutionally protected.

5

*FAIR* did have occasion to reach this issue, and it made clear that the refusal to deal is itself not protected conduct. *See Jordahl v. Brnovich*, No. 18-16896, 2018 U.S. App. LEXIS 31057, at \*4-5 (9th Cir. Oct. 31, 2018) (Ikuta, J., dissenting from denial of stay pending appeal) (*Claiborne* "did not hold that the boycotters' refusal to purchase from white-owned businesses was protected by the First Amendment, or even address the issue," and "we are bound by *FAIR*"). This Court should do the same.

### III.  To the extent O.C.G.A. § 50-5-85 burdens speech, it does so only incidentally and is a permissible regulation of conduct under *O'Brien*.

As Defendants demonstrated in their initial brief, § 50-5-85 does not regulate, even incidentally, protected conduct or speech, and Martin's claims fail as a result. But even if it does, it is a permissible content-neutral regulation under *United States v. O'Brien*, 391 U.S. 367 (1968), because it promotes a substantial state interest that would be achieved less effectively absent the statute.

In attempting to show otherwise, Martin argues first that strict, rather than intermediate, scrutiny applies because § 50-5-85 is a content- or viewpoint-based regulation of speech. She points for support to the fact that the statute regulates only to refusals to deal with Israel and not, for example, refusals to deal with Palestine, Saudi Arabia, or Iraq. But as shown, § 50-5-85 is aimed at conduct, not speech. And the fact that the statute targets only boycotts of Israel does not render it content based. Indeed, as discussed, § 50-5-85 is no more content based than the Solomon Amendment, which targeted and penalized refusals to deal with only one particular group – military recruiters – yet was described by the Supreme Court as a "neutral regulation." *See FAIR*, 547 U.S. at 67. Martin's reasoning is also incompatible with the litany of state and federal anti-

discrimination statutes which prohibit conduct directed at some, but not all, groups. *See, e.g.,* 38 U.S.C. § 4311 (prohibiting discrimination against military members); 8 U.S.C. § 1324b(a)(1)(B),(3) (prohibiting discrimination of permanent resident aliens); 29 U.S.C. §§ 621-634 (forbidding age discrimination against people age 40 or older but not under 40). Despite targeting only some groups for protection, "federal and state antidiscrimination laws … [are] permissible content-neutral regulation[s] of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). So too is § 50-5-85. The same is true here.

Plaintiff relies on *Boos v. Barry*, 485 U.S. 312 (1988), in support of her "content based" argument. There, the Supreme Court found a law content based because it prohibiting picketing in front of foreign embassies *only* if the message was critical of foreign governments, but did not prohibit favorable messages. *Id.* at 318-319. Section 50-5-85 does no such thing. It applies to all discriminatory boycotts of Israel without reference to the underlying motivation or viewpoint. It is, accordingly, content neutral. *See, e.g., City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (ordinance prohibiting the posting of signs on public property "is neutral – indeed it is silent – concerning any speaker's point of view").[4]

Martin next takes issue with Defendants' "reliance on *FAIR* in making [their] *O'Brien* argument." *See FAIR*, 547 U.S. at 67 (even if the Solomon Amendment incidentally burdened speech, it would pass intermediate scrutiny under *O'Brien*). She

---

[4] Martin goes on to discuss cases applying strict scrutiny to content-based regulations of speech and contends that § 50-5-85 "fails muster" under such scrutiny. *See* Doc. 43 at 18-19. Because § 50-5-85 is not a content-based regulation of speech but a neutral regulation of conduct which, at most, incidentally burdens speech, this discussion is irrelevant.

argues that the Solomon Amendment only incidentally burdened speech because it did not limit what law schools may say or require them to say anything, leaving them "free to engage in other protest activities," whereas § 50-5-85's burden on speech is substantial. But her description of the Solomon Amendment applies equally to § 50-5-85. It imposes no limitation on what contractors may say; nor does it require them to say anything. And just like the law schools in *FAIR*, those who choose to contract with Georgia remain free to engage in protest or expressive activities. Like the Solomon Amendment, any burden on speech resulting from § 50-5-85 regulation of conduct is, at most, only incidental.

Finally, Martin argues that, because the aim of § 50-5-85 is to "prohibit expressive speech criticizing Israel as a prerequisite to contracting with Georgia," it cannot be "unrelated to the suppression of free expression." *See O'Brien*, 391 U.S. at 377 (requiring a showing that "the government interest is unrelated to the suppression of free expression"). Her argument fails because its premise is without basis. Section 50-5-85 targets non-expressive economic conduct; it does not prohibit expressive speech critical of Israel, or any speech for that matter.[5] "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct.… [T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (citing *FAIR*). Georgia has the power to regulate commercial conduct and prohibit discriminatory conduct, and that is precisely what § 50-5-85 does. To the extent it

---

[5] To the extent Martin is complaining here about the certification requirement, as discussed below, *see infra*, Sec. IV, it is not a restriction on expressive speech critical of Israel, but simply a contract term which specifies what conduct will not occur – boycotts.

imposes an incidental burden on expression in the process, the First Amendment does not prohibit it from doing so. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring) ("[t]he Constitution does not guarantee a right to choose employees, customers, *suppliers*, *or those with whom one engages in simple commercial transactions*, without restraint from the State.") (emphasis added).[6]

## IV.  O.C.G.A. § 50-5-85's certification requirement does not compel speech.

Martin's claim that § 50-5-85's certification requirement amounts to compelled speech relies on a mischaracterization of what the requirement entails. She contends that it "forces" her to "sign a loyalty oath" to Israel, "compels her 'to confess by word or act [her] faith' in [] pro-Israel orthodoxy," and mandates that she "pledge allegiance to [Georgia's] preferred policies." If this were in fact the case, then perhaps the two cases on which she relies – *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (requiring residents to display "Live Free or Die" motto on license plates), and *Board of Education v. Barnette*, 319 U.S. 624 (1943) (forcing students to recite the pledge of allegiance while giving the flag salute) – would have at least some relevance here. But it is not, and they have none.

Section 50-5-85 requires only written certification (and, of course, only from those who voluntarily choose to contract with the state) that one "is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel" – conduct which itself is not, as shown, constitutionally protected. *See Cole v. Richardson*, 405 U.S. 676, 686 (where there is no constitutionally protected right to engage in particular conduct,

---

[6] Although Martin asserts in the heading preceding her discussion of *O'Brien* that § 50-5-85 "does not further a substantial state interest" (*see* Doc. 43 at 17), she undertakes no real discussion of this *O'Brien* factor.

no constitutional right is infringed by an oath to not engage in the conduct). Certification

requirements like this are common. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104,

116 (2d Cir. 2001) ("[i]nnumerable federal and state regulatory programs require the

disclosure of ... commercial information"). And they do not amount to compelled speech,

because they do not compel allegiance to, or the dissemination of, a particular political or

ideological message. *See, e.g., United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995);

*Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984) (observing that a First Amendment

challenge to a requirement that recipients of federal funding certify they did not

discriminate on the basis of sex "warrant[ed] only brief consideration"). They require

contractors "only to provide the government with information" about whether they meet

government contracting requirements. *See Sindel*, 53 F.3d at 878. Despite Martin's claims

to the contrary, that is all § 50-5-85 requires. Her compelled speech claim fails.

## V.   O.C.G.A. § 50-5-85 is not unconstitutionally overbroad.

Martin's facial overbreadth challenge to § 50-5-85 likewise fails. She acknowledges,

as she must, that a statute is facially overbroad in the First Amendment context only when

it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the

statute's plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003)

(quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). And where, as here, a statute

aims to regulate conduct and not merely speech, its overbreadth must be not only be

substantial, but real, before a court will invalidate the statute. *See, e.g., New York v.*

*Ferber*, 458 U.S. 747, 769 (1982). Martin contends this heavy burden is met because, even

assuming the state can regulate commercial choices without running afoul of the First

Amendment, § 50-5-85 reaches far beyond that to conduct such as "association, soliciting, picketing, and other forms of advocacy." She points, in particular, to the phrase "other actions that are intended to limit commercial relations with Israel …" in the statute's definition of "boycott of Israel"[7] and argues that a district court in Texas opined that similar language in a Texas statute encompasses non-commercial conduct, such as donating to political organizations, picketing outside of Best Buy, and urging others not to buy Israeli products. *See* Doc. 43 at 30-31 (citing *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 756 (W.D. Tex. 2019)). But *Amawi* is, of course, not binding here. And perhaps more importantly, the *Amawi* court's observation was based on a different, and arguably broader, definition of boycott. *See id.* ("The statute defines 'boycott Israel' to include 'otherwise taking any action that is intended to penalize, inflict harm on, or limit commercial relations specifically with Israel, ….'").

Regardless, as shown in Defendants' initial brief, following the canon providing that general terms in a list are to be read in the context of the list's specific terms (as Georgia courts do), the term "other actions" in § 50-5-85(a)(1) must be read to cover only commercial conduct, not speech. Properly read, the statute does not encompass a "substantial amount" of protected speech in relation to its plainly legitimate sweep. And because the statute is readily susceptible to this construction, the Court must so construe it, if necessary, before imposing the "strong medicine" and "last resort" of facial invalidation. *See, e.g., Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) ("Before

---

[7] *See* O.C.G.A. § 50-5-85(a)(1) (defining "boycott of Israel" to include "refusals to deal," "terminating business activities," and "other actions that are intended to limit commercial relations with Israel").

invalidating a state statute on its face, a federal court must determine whether the statute is readily susceptible to a narrowing construction by the state courts.").

## VI.  O.C.G.A. § 50-5-85 is not unconstitutionally vague.

Martin also raises a facial vagueness challenge. It fails. First, here, as here, an enactment implicates no constitutionally protected conduct, the inquiry on a facial vagueness challenge is whether "the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). Section 50-5-85 has numerous clear applications, and Martin does not attempt to show otherwise. Instead, she argues that heightened vagueness scrutiny applies because the statute regulates protected speech. But as shown herein and in Defendants' initial brief, the statute does no such thing. Martin's facial vagueness challenge thus fails.

Second, Martin's challenge fails even assuming the statute implicates some protected conduct. "A law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *First Vagabonds Church of God v. City of Orlando*, 610 F.3d 1274, 1286 (11th Cir. 2010) (quoting *United States v. Williams*, 553 U.S. 285 (2008)). Martin points to three terms in the statute which she claims fail to meet this standard. First, relying on *Amawi*, she again complains that it is unclear if the "other actions" language of § 50-5-85(a)(1) encompasses noncommercial conduct, such as donating to pro-Palestinian organizations and picketing. This contention, as well as the reason Martin's reliance on *Amawi* is misplaced, is addressed above. Any potential vagueness in the phrase is resolved when it is read in conjunction with the more

specific statutory language surrounding it, as it must be. Second, Martin complains that the term "unreasonable" could extend to any "unreasonable conduct."[8] Not so if the word is not plucked entirely out of context and viewed in isolation, as Martin does. When viewed in the context in which it appears, as courts must do, the provision adequately informs state contractors that the statute covers refusals to deal based on discriminatory motives. *See City of S. Miami v. Desantis*, 408 F. Supp. 3d 1266, 1305 (S.D. Fla. 2019) ("The Court concludes that, *when read in context*, the term "impedes" … is not unconstitutionally vague") (emphasis added). Finally, Martin complains that the statute's use of the phrase "valid business reason" renders it unconstitutionally vague. It does not. When a word or phrase has a commonly understood meaning, its use does not render a statute void for vagueness. *See, e.g., Connally v. Gen. Constr. Co*., 269 U.S. 385, 391 (1926). The phrase "valid business reason" is such a phrase and, indeed, it is applied by courts frequently in the context of antitrust law. *See, e.g., High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 991-92 (9th Cir 1993) ("A Section 2 claim will fail if there is a valid business reason for the defendant's refusal to deal."). Martin's vagueness challenge fails.

## VII. Georgia may impose conditions in the contracting context that it may not be able to impose directly.

Under the heading "Georgia cannot impose unconstitutional conditions on contracts," Martin purports to rebut what she describes as Defendants' claim that "the First Amendment does not apply" in the context of government contracts. But Defendants made

---

[8] *See* O.C.G.A. § 50-5-85(a)(1)(B) (defining "boycott of Israel" to include refusals to deal taken "[i]n a manner that discriminates on the basis of nationality, national origin, religion, or other unreasonable basis that is not founded on a valid business reason").

no such argument in their initial brief, nor do they now. Rather, pointing to case law in the government spending and contracting contexts, Defendants show that governments are generally afforded wider latitude to impose conditions on the receipt of government funds than in the context of generally applicable laws. *See* Doc. 37-1 at 26-31. As it is based on a misreading of Defendants' argument, much of Martin's response is inapposite.

For instance, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996), on which Martin primarily relies, is inapplicable. It concerned the issues of whether Umbehr was properly considered an independent contractor or an employee of the board of commissioners and whether the *Pickering* balancing test applied to claims that he was terminated because of his criticism of the county board. *Id*. And the *Umbehr* Court did not, as Martin suggests, reject the idea that the leeway accorded states when acting as contractors should be at least as broad as that of the federal government when exercising its spending power. Likewise, despite Martin's claim to the contrary, the Supreme Court's statement in *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996), that the government's flexibility to terminate at-will relationships cannot be used "to impose conditions on expressing, or not expressing, specific political views" does not apply here. Section 50-5-85 imposes no such conditions on contractors. It imposes restrictions only on consumer choices, a contracting condition that *O'Hare* does not proscribe.

Finally, Martin argues that, even if the spending power cases cited by Defendants have relevance here, the Supreme Court has not upheld spending power legislation which seeks to leverage funding to regulate speech beyond the contours of the program. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*. (*USAID*), 570 U.S. 205, 214-15

14

(2013). But, even assuming *USAID*'s applicability here, § 50-5-85 does not run afoul of this concept. Georgia is not trying to control its contracting partners' activities outside the context of contracting. The statute applies only to contracting decisions, precluding a contractor from refusing to deal with Israel, Israeli entities, or entities that do business with or in Israel. It neither seeks to regulate nor regulates speech beyond that.

## VIII.   The individual capacity defendants are entitled to qualified immunity.

Finally, Martin contends that defendants Overstreet, Blitch, and Lensch – who are alleged only to have followed the requirements of § 50-5-85, as they must, by drawing her attention to the challenged language in the contract and/or transmitting the contract to her for signature – had "fair and clear warning" that their conduct violated her constitutional rights. She claims that *Claiborne* clearly establishes this and that *FAIR* "did nothing to un-establish" it. But, as discussed, *Claiborne* does not clearly establish that decisions not to buy or sell goods or services, the only conduct regulated by § 50-5-85, are protected by the First Amendment. Neither § 50-5-85 nor any similar law has been interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. *See Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1280 (11th Cir. 2002). Nor have these courts addressed the constitutionality of § 50-5-85. Thus, there is no clearly established law that could have put the individual defendants on notice that their conduct would amount to a constitutional violation. They are entitled to qualified immunity.

## CONCLUSION

For the reasons stated above and Defendants' initial brief, Defendants respectfully request that their motion to dismiss the Amended Complaint be granted.

Respectfully submitted,

CHRISTOPHER M. CARR        112505
Attorney General

KATHLEEN M. PACIOUS        558555
Deputy Attorney General

ROGER A. CHALMERS          118720
Senior Assistant Attorney General

/s/*Deborah Nolan Gore*
DEBORAH NOLAN GORE         437340
Assistant Attorney General

PLEASE SERVE:

Deborah Nolan Gore
40 Capitol Square, S.W
Atlanta, GA  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-6920
dgore@law.ga.gov

16

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1, I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point New Times Roman type face.

*/s/ Deborah Nolan Gore*
DEBORAH NOLAN GORE
Georgia Bar No. 437340

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record in this case.

This 12th day of November, 2020.

*/s/ Deborah Nolan Gore*
DEBORAH NOLAN GORE

Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, GA  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-6920
dgore@law.ga.gov