IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **ABBY MARTIN,**<br>**Los Angeles County, California,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**STEVE WRIGLEY, Chancellor for**<br>**the Board of Regents of the**<br>**University System of Georgia, in his**<br>**Official Capacity; KYLE**<br>**MARRERO, President of Georgia**<br>**Southern University, in his Official**<br>**Capacity; BONNIE OVERSTREET,**<br>**Conference Services Manager for**<br>**Georgia Southern University, in her**<br>**Individual Capacity; MICHEL**<br>**BLITCH, Conference Services**<br>**Coordinator for Georgia Southern**<br>**University, in her Individual**<br>**Capacity; and SANDRA LENSCH,**<br>**Conference Services Specialist for**<br>**Georgia Southern University, in her**<br>**Individual Capacity,**<br><br>    **Defendants.** | **CIVIL ACTION FILE**<br><br>**NO. 1:20-CV-596-MHC** |

## ORDER

This case comes before the Court on Defendants' Motion to Dismiss

Plaintiff's First Amended Complaint ("Mot. to Dismiss") [Doc. 37].

## I.   BACKGROUND[1]

Plaintiff Abby Martin ("Martin") is a journalist who frequently expresses

views in support of the rights of Palestinians and the Boycott, Divestment,

Sanctions ("BDS") movement, which supports a political and economic boycott of

Israel based on actions taken by the Israeli government with respect to its

occupation of Palestinian territory.  First Am. Compl. ("Am. Compl.") [Doc. 26]

¶¶ 4, 21.  On July 19, 2019, Georgia Southern University ("GSU") invited Martin

to speak at the 2020 International Critical Media Literary Conference (the

"Conference"), which was to be hosted by GSU.  Id. ¶ 5.  Martin accepted the

invitation.  Id.  One week later, a professor at GSU and conference co-chair

emailed several professors at other academic institutions to inform them that

Martin had been selected as the keynote speaker for the Conference.  Id. ¶ 40.  In

that email, the professor referred to Martin as a "fantastic Key Note," and planning

for the Conference continued.  Id. ¶¶ 40-41.

On September 11, 2019, Defendants Overstreet, Blitch, and Lensch, on

behalf of Defendants Wrigley and Marrero, sent Martin an agreement for her

---

[1] Because this case is before the Court on a motion to dismiss, the facts are
presented as alleged in Plaintiff's Complaint.  Silberman v. Miami Dade Transit,
927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

engagement as an independent contractor to provide her keynote presentation in exchange for a $1,000 honorarium as well as costs of travel and lodging. Id. ¶¶ 5, 42. On September 18, 2019, Defendants Overstreet, Blitch, and Lensch wrote Martin again to "draw [her] attention [to] legal language that the University and State of Georgia require us to include" and to state that her invitation would be honored only "[i]f this language is acceptable." Id. ¶¶ 43-44. The language referenced in the agreement was the following clause: "You certify that you are not currently engaged in, and agree for the duration of this agreement not to engage in, a boycott of Israel, as defined in O.C.G.A. Section 50-5-85." Id. ¶¶ 5, 43. This certification was required pursuant to Georgia Senate Bill 327, codified as O.C.G.A. § 50-5-85, which became effective on May 9, 2017. Id. ¶¶ 3, 43, 49-50.

O.C.G.A. § 50-5-85 provides, in pertinent part, as follows:

> The state shall not enter into a contract with an individual or company if the contract is related to construction or the provision of services, supplies, or information technology unless the contract includes a written certification that such individual or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel.

O.C.G.A. § 50-5-85(b). The law defines "Boycott of Israel" to mean

> engaging in refusals to deal with, terminating business activities with, or other actions that are intended to limit commercial relations with Israel or individuals or companies doing business in Israel or in Israeli-controlled territories, when such actions are taken:

3

> (A) In compliance or adherence to calls for a boycott of Israel other than those boycotts to which 50 U.S.C. App. Section 2407(c), as it existed on January 1, 2016, applies; or
> (B) In a manner that discriminates on the basis of nationality, national origin, religion, or other unreasonable basis that is not founded on a valid business reason.

O.C.G.A. § 50-5-85(a).

Martin responded the same day, stating: "I'm sure you know, a lot of my work advocates the boycott of Israel, and my new film features that call to action. I cannot sign any form promising not to boycott Israel." Id. ¶¶ 5, 45. As a result, Defendants prevented Martin from speaking at the Conference and receiving the $1,000 honorarium, and subsequently cancelled the Conference. Id. ¶¶ 6-7, 50, 52. As a result, Martin was deprived of her ability to speak on the GSU campus, to receive the honorarium, and to showcase her work. Id. ¶¶ 53-55. Martin, a frequent public speaker, alleges that she is likely to be prevented from speaking on other college campuses overseen by Wrigley. Id. ¶ 56.

On July 28, 2020, Martin filed her First Amended Complaint in the above-styled action alleging that O.C.G.A. § 50-5-85 violates the First and Fourteenth Amendments to the United States Constitution by impermissibly infringing on Martin's guaranteed rights to freedom of speech, freedom of association, and due process. Am. Compl. ¶¶ 57-95. Martin seeks, *inter alia*, an injunction against the

continuing enforcement of the statute, a declaration that the statute is unconstitutional, and damages against Defendants Overstreet, Blitch, and Lensch in their individual capacities. Id., Prayer for Relief.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III.  DISCUSSION

"It is well established that [42 U.S.C. §] 1983 itself creates no substantive rights; it merely provides a remedy for deprivations of federal rights established elsewhere." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987) (citing City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985)). To sustain a cause of action based on section 1983, a litigant must establish two elements: (1) that she suffered a deprivation of a right, privilege, or immunity protected by the U.S. Constitution or federal law, and (2) that the act or omission

6

causing the deprivation was committed by a person acting under color of state law. Livadas v. Bradshaw, 512 U.S. 107, 132 (1994); Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998). "[S]ection 1983 imposes liability only 'for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.'" Wideman, 826 F.2d at 1032 (quoting Baker v. McCollan, 443 U.S. 137, 146 (1979)). Accordingly, "[i]n any § 1983 action, a court must determine 'whether the Plaintiff has been deprived of a right secured by the Constitution and laws of the United States.'" Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting Baker, 443 U.S. at 146). "Absent the existence of an underlying constitutional right, no section 1983 claim will lie." Wideman, 826 F.2d at 1032.

Martin asserts two causes of action under 42 U.S.C. § 1983, claiming that Defendants' enforcement of O.C.G.A. § 50-5-85 violates her First and Fourteenth Amendment rights to freedom of speech and assembly (Count One) and her Fourteenth Amendment right to due process (Count Two). Am. Compl. ¶¶ 57-95. Defendants contend that O.C.G.A. § 50-5-85 is constitutional, so that Martin's claims fail as a matter of law. Mot. to Dismiss.

A.   **Martin's Complaint States a Claim Upon Which Relief Can Be Granted That O.C.G.A. § 50-5-85 Violates Martin's First and Fourteenth Amendment Rights to Freedom of Speech and Assembly.**

   1.   **Martin's Advocacy of a Boycott of Israel Constitutes Protected Activity Under the First Amendment.**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble . . . ." U.S. Const. amend. I.  The First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  Schneider v. State of New Jersey, 308 U.S. 147, 160 (1939).

The Supreme Court has held that state government employment cannot be conditioned "on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments[.]"  Cole v. Richardson, 405 U.S. 676, 680 (1972).  This same principle also applies to those contracting with the government, absent a special government interest.  Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr, 518 U.S. 668, 677-78 (1996).  The Supreme Court also has "long held . . . that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in

violation of an ordinance against dishonoring the flag is not." R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 385 (1992).

Defendants assert that this case is controlled by the Supreme Court's holding in Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. ("FAIR"), 547 U.S. 47 (2006). Br. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Br.") [Doc. 37-1] at 5-9, 15-21. In FAIR, the Supreme Court addressed the constitutionality of the Solomon Amendment, which required universities receiving federal funding to grant military recruiters the same access to college campuses as provided to other recruiters. FAIR, 547 U.S. at 51. A coalition of law schools and faculty members seeking to bar military recruiters' access to their campuses in protest of the military's discrimination based on sexual orientation filed a lawsuit claiming that the Solomon Amendment violated the First Amendment. Id. at 52. The Supreme Court held that "[a]s a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must do—afford equal access to military recruiters—not what they may or may not say." Id. at 60. In particular, the Supreme Court noted that law schools were only compelled to provide minimal accommodations to military recruiters which were non-monetary and equal to the accommodations extended to all employment recruiters on campus. Id. at 61 n.4. Defendants also rely upon Int'l Longshoremen's Ass'n v. Allied Int'l, Inc., 456

9

U.S. 212, 226-27 (1982), which held that "secondary picketing by labor unions" in violation of the National Labor Relations Act is not protected activity under the First Amendment. Defs.' Br. at 17-18.

Martin asserts that the controlling Supreme Court precedent that determines the unconstitutionality of O.C.G.A. § 50-5-85 under the First Amendment is NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982). Br. in Opp'n of Defs.' Mot. to Dismiss ("Pl.'s Br.") [Doc. 43] at 6. In Claiborne, a Mississippi branch of the NAACP launched a boycott of white merchants in support of demands for racial equality and integration. Claiborne, 458 U.S. at 889, 899-900. Actions taken in support of the boycott included nonviolent activities such as marches and picketing as well as violent enforcement against boycott violators which allegedly included damage to property and even physical assault. Id. at 902-05. The Supreme Court held that "the nonviolent elements of [boycotters]' activities are entitled to protection of the First Amendment." Id. at 915. The opinion did not address whether this protection extended to "a narrowly tailored statute designed to prohibit certain forms of anticompetitive conduct or certain types of secondary pressure." [2] Id. at 915, n.49. However, "[t]he right of the States to regulate

_____

[2] Subsequent to Claiborne, the Supreme Court distinguished boycotts for political reasons from those conducted for economic reasons. F.T.C. v. Superior Ct. Trial Laws. Ass'n, 493 U.S. 411, 427 (1990). In Trial Laws., the Court distinguished

economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental change and effectuate rights guaranteed by the Constitution itself." Id. at 914.

Defendants' argument that FAIR and Int'l Longshoremen rather than Claiborne govern as to whether O.C.G.A. § 50-5-85 infringes on Martin's First Amendment rights fails. FAIR is distinguishable because the Solomon Amendment, in contrast to O.C.G.A. § 50-5-85, was aimed at changing the "result achieved" by the law schools' recruiting policy rather than the content of such policies. FAIR, 547 U.S. at 57. O.C.G.A. § 50-5-85, on the other hand, focuses exclusively on the motive behind an individual's refusal to deal with Israel rather than the result achieved by any boycott. See O.C.G.A. § 50-5-85(a)(1)(B) (allowing contractors to refuse to deal with or terminate business activities with Israel as long as their action is "founded on a valid business reason."). Because O.C.G.A. § 50-5-85 allows or prohibits the same conduct depending solely on the

---

political boycotts such as the one in Claiborne with boycotts seeking to gain an economic advantage for boycott participants. Trial Laws., 493 U.S. at 426. The boycotts prohibited by O.C.G.A. § 50-5-85, in contrast, are political boycotts. See O.C.G.A. § 50-5-85(a)(1)(B) (excluding from the definition of "Boycott of Israel" any refusal to deal "founded on a valid business reason."). Accordingly, the boycotts at issue here do not fall under the reserved question in Claiborne.

11

motive behind it, it is the content of behavior rather than the result that this statute

purports to regulate.  Int'l Longshoremen also is distinguishable because the

Supreme Court's holding in that case was limited to secondary picketing and

boycotts in the labor union context which threatened to infringe upon the rights of

others.  Int'l Longshoremen, 156 U.S. at 226-27.

   In fact, Defendants' argument has been rejected in other cases addressing

state statutes similar to O.C.G.A. § 50-5-85, where it has been held that the type of

restriction imposed upon Martin involves protected expression under the First

Amendment.  In Jordahl v. Brnovich, 336 F. Supp. 3d 1016 (D. Ariz. 2018),

vacated and remanded, 789 F. App'x 589 (9th Cir. 2020),[3] the district court

considered the Arizona statute which prohibited public entities from contracting

with companies that engage in boycotts of Israel.  The district court in Jordahl

rejected the defendants' reliance on FAIR and Int'l Longshoremen and instead

relied upon Claiborne to hold that the conduct evidenced by the boycotting of

consumer goods and services offered by businesses that support Israel's occupation

of Palestinian territories is deserving of First Amendment protection:

---

[3] Jordahl was vacated and remanded after the Arizona legislature revised the statute
at issue, which mooted the underlying claims.  See Jordahl v. Brnovich, 789 F.
App'x 589 (9th Cir. 2020).

In accordance with <u>Claiborne</u>, these types of boycotting activities, which clearly include "the practice of persons sharing common views banding together to achieve a common end," are entitled constitutional protections. 458 U.S. at 907. The Act here specifically and generally enumerates certain activity companies cannot engage in if they wish to contract with a public entity. Specifically, the Act prohibits companies from "engaging in a refusal to deal," "terminating business activities" or "performing *other actions* that are intended to limit commercial relations." A.R.S. § 35-393(1) (emphasis added). These actions, however, are only prohibited when taken "in compliance with or adherence to calls for a boycott of Israel." <u>Id.</u> The language of the Act thus necessarily contemplates prohibiting collective conduct aimed "to achieve a common end"; here, a "boycott of Israel." 458 U.S. at 907-08.

\*\*\*

A restriction of one's ability to participate in collective calls to oppose Israel unquestionably burdens the protected expression of companies wishing to engage in such a boycott. The type of collective action targeted by the Act specifically implicates the rights of assembly and association that Americans and Arizonans use "to bring about political, social, and economic change." <u>Claiborne</u>, 458 U.S. at 911 (stating "[t]he established elements of speech, assembly, association, and petition, though not identical, are inseparable") (internal quotation omitted) . . . . Under <u>Claiborne</u>, this conduct is deserving of First Amendment protection. Plaintiffs claim is therefore not foreclosed by <u>Int'l Longshoremen</u>.

<u>Id.</u> at 1042-43 (parallel citations omitted).

In <u>Amawi v. Pflugerville Indep. Sch. Dist.</u>, 373 F. Supp. 3d 717 (W.D. Tex. 2019), <u>vacated and remanded sub nom.</u> <u>Amawi v. Paxton</u>, 956 F.3d 816 (5th Cir.

2020),[4] Texas enacted an "anti-BDS" statute to prohibit the boycotting of Israel as

a condition of public employment.  The district court in <u>Amawi</u> concluded that the

boycotts against Israel were inherently expressive conduct and protected speech:

> <u>Claiborne</u>, not <u>FAIR</u>, governs this case. Texas does not dispute that
> Plaintiffs' boycotts are political; they support the BDS movement's
> "dispute with the Israeli government's policies." (Texas Resp. Mots.
> Dismiss, Dkt. 25, at 18). <u>Claiborne</u> deals with political boycotts; <u>FAIR</u>,
> in contrast, is not about boycotts at all.  The Supreme Court did not treat
> the <u>FAIR</u> plaintiffs' conduct as a boycott: the word "boycott" appears
> nowhere in the opinion, the decision to withhold patronage is not
> implicated, and <u>Claiborne</u>, the key decision recognizing that the First
> Amendment protects political boycotts, is not discussed.
>
> \*\*\*
>
> The statute defines "boycott Israel" according to the expressive purpose
> behind the refusal to buy things.  <u>See</u> Tex. Gov. Code § 808.001
> ("boycott Israel" defined to mean "refusing to deal with, terminating
> business activities with, or otherwise taking any action that is intended
> to penalize, inflict harm on, or limit commercial relations specifically
> with Israel, or with a person or entity doing business in Israel or in an
> Israeli-controlled territory").  And it expressly exempts refusing to
> contract with Israel "for ordinary business purposes." <u>Id.</u>  Accordingly,
> H.B. 89's no-boycott provision applies by its express terms *only* to
> expressive conduct.

<u>Id.</u> at 743-45.

---

[4] <u>Amawi</u> was vacated and remanded after the Texas legislature revised the statute
at issue, which mooted the underlying claims.  <u>See</u> <u>Amawi v. Paxton</u>, 956 F.3d 816
(5th Cir. 2020).

Koontz v. Watson, 283 F. Supp. 3d 1007 (D. Kan. 2018), reviewed Kansas's law requiring all persons who contract with the state to certify that they are not engaged in a boycott of Israel. In granting a preliminary injunction, the district court again relied on Claiborne and distinguished FAIR:

> The conduct prohibited by the Kansas Law is protected for the same reason as the boycotters' conduct in Claiborne was protected.
>
> The Kansas Law here is different than the requirement at issue in [FAIR]. The conduct the Kansas Law aims to regulate is inherently expressive. See Claiborne, 458 U.S. at 907–08. It is easy enough to associate plaintiff's conduct with the message that the boycotters believe Israel should improve its treatment of Palestinians. And boycotts—like parades—have an expressive quality. Id. Forcing plaintiff to disown her boycott is akin to forcing plaintiff to accommodate Kansas's message of support for Israel. Because the Kansas Law regulates inherently expressive conduct and forces plaintiff to accommodate Kansas's message, it is unlike the law at issue in [FAIR].

Id. at 1022, 1024 (parallel citation omitted).

Defendants contend that these cases were wrongly decided and instead rely upon Ark. Times LP v. Waldrip, 362 F. Supp. 3d 617 (E.D. Ark. 2019), as a correct application of FAIR rather than Claiborne to "a very similar state law which likewise prohibits state entities from contracting with companies that boycott Israel." Defs.' Br. at 18-19. Defendants' position has been undermined by the recent reversal of the Waldrip district court's decision by the United States

Court of Appeals for the Eighth Circuit, <u>Ark. Times LP v. Waldrip</u>, 988 F.3d 453

(8th Cir. 2021), which contains the following pertinent discussion:

> The State says this case is indistinguishable from <u>FAIR</u> because a
> decision not to purchase Israeli goods, like the decision to bar military
> recruiters from campus, is "all but invisible absent explanatory speech."
> According to the State, "a boycott of Israel is [simply] not expressive
> conduct," and as such is not entitled to First Amendment protection.
> But the comparison is not an exact fit because <u>FAIR</u> did not concern a
> boycott.    In <u>FAIR</u>, the Supreme Court addressed the Solomon
> Amendment, which gave universities "a choice: Either allow military
> recruiters the same access to students afforded any other recruiter or
> forgo certain federal funds."  The Court thus focused narrowly on the
> law schools' conduct in relation to military recruiters and never
> characterized it more broadly as a "boycott."  Here, we are faced with
> a statute that expressly concerns and prohibits "boycotts."

<u>Id.</u> at 462.   Like O.C.G.A. § 50-5-85, the Arkansas statute defined "boycott of

Israel" to include "other actions that are intended to limit commercial relations

with Israel, or persons or entities doing business in Israel or in Israeli-controlled

territories."  <u>Id.</u> at 464 (quoting Ark. Code Ann. § 25-1-502(a)(A)(i)).

> Considering the Act as a whole, we conclude that the term "other
> actions" in the definition of "boycott Israel" and "boycott of Israel"
> encompasses more than "commercial conduct" similar to refusing to
> deal or terminating business activities.   Instead, the Act requires
> government contractors, as a condition of contracting with Arkansas,
> not to engage in economic refusals to deal with Israel *and* to limit their
> support and promotion of boycotts of Israel.  As such, the Act restricts
> government contractors' ability to participate in speech and other
> protected, boycott-associated activities recognized by the Supreme
> Court in <u>Claiborne</u>.  See 458 U.S. at 915.  Therefore, the Act imposes a
> condition on government contractors that implicates their First
> Amendment rights.

16

Id. at 466-67 (footnote and parallel citation omitted).

Like the decisions reviewing anti-boycotting statutes in Jordahl, Amawi, Koontz, and Waldrip, this Court concludes that O.C.G.A. § 50-5-85 imposes a condition on those who contract with the state of Georgia that implicates the contractors' First Amendment rights.

### 2. O.C.G.A. § 50-5-85 Burdens Martin's Speech and Is Not Narrowly Tailored to Further a Substantial State Interest.

Statutes which create a content-neutral, incidental burden on speech are permissible if the statute furthers a substantial governmental interest and the burden is no greater than necessary to further the interest. See United States v. O'Brien, 391 U.S. 367, 376-77 (1968). In contrast, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015) (citations omitted); see also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). A statute defining regulated speech by its function or purpose draws a distinction based on

17

its message and, accordingly, is a content-based regulation subject to strict
scrutiny.  Reed, 576 U.S. at 164.

Defendants contend that any burden imposed upon speech by O.C.G.A.
§ 50-5-85 is neutral and incidental.  Defs.' Br. at 21-22.  In addition, Defendants
assert that O.C.G.A. § 50-5-85 "promotes a substantial state interest—namely,
Georgia's interest in helping advance a long-standing federal foreign policy goal."
Id. at 23-24.  In response, Martin contends that O.C.G.A. § 50-5-85 burdens speech
and the state's purported interest is nothing more than a mechanism for stifling
expression.  Pl.'s Br. at 13-16.

O.C.G.A. § 50-5-85 is content-based because the statute exempts boycotts of
Israel that are "founded on a valid business reason."  O.C.G.A. § 50-5-85(a)(1)(B).
Therefore, whether the state of Georgia will enter into an agreement with a
contractor that refuses to engage in business with Israel is premised entirely upon
the motive behind the contractor's decision.

Because the burden on speech imposed by O.C.G.A. § 50-5-85 is content-
based, it is subject to strict scrutiny.  Reed, 576 U.S. at 164, 171.  This means that
the government must show that the statute serves a compelling governmental
interest and that any burden on speech be essential and narrowly tailored to further
that interest.  Id. at 171 (citing Ariz. Free Enter. Club's Freedom Club PAC v.

18

Bennett, 564 U.S. 721, 734 (2011)).  Even assuming that Georgia's interest in

furthering foreign policy goals regarding relations with Israel is a substantial state

interest, Defendants fail to explain how Martin's advocacy of a boycott of Israel

has any bearing on Georgia's ability to advance foreign policy goals with Israel.

The law also is not narrowly tailored to achieve the state's purported interest for

the same reasons that Kansas's law was enjoined:

> But even if one assumed that Kansas had passed the law to achieve
> constitutionally permissible goals that would not change the outcome
> here.  It is still unconstitutional because it is not narrowly tailored to
> achieve those permissive goals.  If Kansas had passed its law to regulate
> boycotts intended to suppress economic competition coming from
> Israel—a goal that Claiborne permits—the Kansas Law is
> overinclusive.  It is overinclusive because it also bans political boycotts,
> which is impermissible.  See Garrison v. Louisiana, 379 U.S. 64, 74–
> 75 (1964) ("[S]peech concerning public affairs is more than self-
> expression; it is the essence of self-government.").  Likewise, if the
> Kansas Law's goal is to promote trade relations with Israel—also a
> permissible goal—the Kansas Law is underinclusive because it only
> regulates boycotts but does not regulate other conduct that affects trade.

Koontz, 283 F. Supp. 3d at 1023 (parallel citation omitted).

The Court notes that, even if it were to apply intermediate scrutiny pursuant

to O'Brien, as Defendants would have this Court do, the factors still weigh in favor

of Martin.  See Defs.' Br. at 21 (citing O'Brien, 391 U.S. at 377).  "[The Supreme]

Court has held that when 'speech' and 'nonspeech' elements are combined in the

same course of conduct, a sufficiently important governmental interest in

19

regulating the nonspeech element can justify incidental limitations on First

Amendment freedoms." O'Brien, 391 U.S. at 376.  In such a case, the Constitution

requires that "the incidental restriction on alleged First Amendment freedoms is no

greater than is essential to the furtherance of that interest" and that "the

governmental interest is unrelated to the suppression of free expression." Id. at

377.

However, the Supreme Court also has held that a facially speech-neutral

statute may still encroach upon activity protected by the First Amendment.  United

States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 469-70 (1995).  In Nat'l

Treasury, the Supreme Court held that even though a statute was content-neutral,

the indirect burden of banning honoraria given to government employees for public

speaking or publication would "chill[] potential speech before it happens" and

disincentivize government employees from public expression.  Nat'l Treasury, 513

U.S. at 468-71.  Here, O.C.G.A. § 50-5-85 has a similar chilling effect because, as

alleged in the First Amended Complaint, the statute effectively bans Martin from

speaking at GSU and presumably other state university campuses.  Moreover,

O.C.G.A. § 50-5-85 arguably is more offensive to the First Amendment than the

statute in Nat'l Treasury because it burdens speech exclusively for those who hold

particular political beliefs.  Accordingly, even under Defendants' proposed

20

intermediate scrutiny test, O.C.G.A. § 50-5-85 places an unconstitutional incidental burden on speech.

Because O.C.G.A. § 50-5-85 prohibits inherently expressive conduct protected by the First Amendment, burdens Martin's right to free speech, and is not narrowly tailored to further a substantial state interest, Defendant's Motion to Dismiss Count One of the First Amended Complaint is **DENIED**.

### 3.    The Statute Unconstitutionally Compels Speech.

The requirement contained in O.C.G.A. § 50-5-85 that parties seeking to contract with the state of Georgia sign a certification that they are not engaged in a boycott of Israel also is unconstitutional compelled speech.  "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment.  Broad and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution."  Baird v. State Bar of Ariz. 401 U.S. 1, 6 (1971).  "Similarly, the State may not condition employment 'on an oath denying past, or abjuring future,' protected speech and associational activities."  Amawi, 373 F. Supp. 3d at 754 (quoting Cole, 405 U.S. at 680).

Because O.C.G.A. § 50-5-85 discriminates based on the motive for engaging in a boycott against Israel, the certification requirement forces parties contracting

with the state of Georgia to publicly assign a motive and speech element to what

Defendants deem merely economic conduct.  The certification that one is not

engaged in a boycott of Israel is no different that requiring a person to espouse

certain political beliefs or to engage in certain political associations.  The Supreme

Court has found similar requirements to be unconstitutional on their face.  See,

e.g., Baird, 401 U.S. at 5-6 (holding unconstitutional a state bar question requiring

applicants to state whether they had ever been a member of the Communist Party

or another organization which advocated the overthrow of the United States

Government by force).

**B.      Martin States a Claim Upon Which Relief Can Be Granted That O.C.G.A. § 50-5-85 Violates Martin's Right to Due Process Under the Fourteenth Amendment.**

In cases arising under the First Amendment, courts "are concerned with the

vagueness of a statute 'on its face' because such vagueness may in itself deter

constitutionally protected and socially desirable conduct."  United States v. Nat'l

Dairy Prods. Corp., 372 U.S. 29, 36 (1963); see also Amawi, 373 F. Supp. 3d at

756 (quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)) ("When dealing with a

statute 'capable of reaching expression sheltered by the First Amendment, the

[vagueness] doctrine demands a greater degree of specificity than in other

contexts.'").  A statute is impermissibly vague when people of common

22

intelligence are left to guess at its precise meaning or when the standard of conduct is not specified.  Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971).

Here, O.C.G.A. § 50-5-85's inclusion of "other actions that are intended to limit commercial relations with Israel" makes the statute impermissibly vague. O.C.G.A. § 50-5-85.  This phrase in particular may leave a reasonable individual to speculate as to what conduct is prohibited.  See Waldrip, 988 F.3d at 466 ("a contractor could readily conclude that it was prohibited from both refusing to economically engage with Israel *and* supporting or promoting a boycott of Israel or Israeli-goods.  A contractor that does not want to risk violating the terms of its contract would likely refrain even from activity that is constitutionally protected."). Despite Defendants' contentions to the contrary, the language in O.C.G.A. § 50-5-85 makes it questionable whether Martin even would be permitted to speak publicly in support of BDS Boycotts while she was engaged in any contract with the state of Georgia.  Public speech which advocates for a boycott of Israel and calls on others to engage in BDS Boycotts could reasonably be interpreted as "actions that are intended to limit commercial relations with Israel." O.C.G.A. § 50-5-85-85(a).  Thus, Martin has sufficiently stated a claim that O.C.G.A. § 50-5-85 is void for vagueness in violation of the Fourteenth Amendment.

**C.      Defendants Overstreet, Blitch, and Lensch Are Shielded From Liability for Damages in Their Individual Capacities Based Upon Qualified Immunity.**

Defendants also contend that, even if Martin has stated a claim under

§ 1983, Defendants Overstreet, Blitch, and Lensch (collectively, the "Individual

Defendants") are entitled to qualified immunity from suit in their individual

capacities because the alleged constitutional right was not clearly established.

Defs.' Br. at 33-35.  Martin contends that the Individual Defendants are not

entitled to qualified immunity because Claiborne clearly establishes the

constitutional violation in this case.  Pl.'s Br. at 30.

"Qualified immunity offers complete protection for individual public

officials performing discretionary functions 'insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'"  Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir.

2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To claim

qualified immunity, a defendant must first show he was performing a discretionary

function.  Barnes v. Zaccari, 669 F.3d 1295, 1303 (11th Cir. 2012).  There is no

24

dispute that the Individual Defendants were acting in the scope of their discretionary authority in this case.[5]

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Edwards v. Shanley, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 572 F.3d 1252, 1254 (11th Cir. 2004).  A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'" Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." Jones v. Fransen,

---

[5] Martin does not respond to Defendants' assertion that the Individual Defendants were acting within the scope of their discretionary authority.  See Pl.'s Br. at 30-31.

857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013

(11th Cir. 2011) (en banc)).  There are three methods to show that the government

official had fair warning:

> First, the plaintiffs may show that a materially similar case has already
> been decided.  Second, the plaintiffs can point to a broader, clearly
> established principle that should control the novel facts of the situation.
> Finally, the conduct involved in the case may so obviously violate the
> constitution that prior case law is unnecessary.  Under controlling law,
> the plaintiffs must carry their burden by looking to the law as
> interpreted at the time by the United States Supreme Court, the
> Eleventh Circuit, or the [relevant State Supreme Court].

Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation

marks, and alterations omitted).  The second and third methods, known as "obvious

clarity" cases, exist when "case law is not needed" to demonstrate the unlawfulness

of the conduct or where the existing case law is so obvious that "every reasonable

government official facing the circumstances would know that the official's

conduct did violate federal law when the official acted." Vinyard v. Wilson, 311

F.3d 1340, 1350-51 (11th Cir. 2002).  Such cases are rare. See, e.g., Santamorena

v. Georgia Military College, 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (noting that

"these exceptional cases rarely arise").

The law at issue in this case is similar to over thirty laws that have been

enacted to restrict the ability of state contractors to support boycotts of Israel.  See

https://www.jewishvirtuallibrary.org/anti-bds-legislation (last visited May 21,

26

2021).  Although there have been district court and courts of appeals decisions that
have considered the constitutionality of these laws discussed by the Court in this
Order, none of them came from the Supreme Court, the Eleventh Circuit, or the
Supreme Court of Georgia.  Martin contends that Claiborne established the broad
principle which controls the analysis of the review of O.C.G.A. § 50-5-85;
however, the analysis undertaken in the cases previously decided involving "anti-
BDS" laws indicates that determination of whether Georgia's law is
unconstitutional is not "clearly established."  Indeed, in the one circuit court of
appeals case that has considered the merits of a similar law, there was a
disagreement among the panel members as to the correct outcome.  See Waldrip,
988 F.3d at 467 (Kobes, J., dissenting).

It is unreasonable to expect that the Individual Defendants in this case would
have been on notice that O.C.G.A. § 50-5-85 was unconstitutional based upon the
application of Claiborne to the specific facts of this case.  "[C]learly established
law should not be defined at a high level of generality.  As this Court explained
decades ago, the clearly established law must be "particularized" to the facts of the
case."  White v. Purdy, 137 S. Ct. 548, 552 (2017) (citations omitted).  And this is
not an "obvious clarity" case where case law is not necessary to establish the
unlawfulness of Defendants' actions.

> As noted, to establish fair warning under this method, plaintiff may
> point to prior case law (from the Supreme Court of the United States,
> the Eleventh Circuit, or the highest court in the relevant state) that is
> materially similar.  This method requires us to consider whether the
> factual scenario that the official faced is fairly distinguishable from the
> circumstances facing a government official in a previous case.
> Although existing case law does not necessarily have to be directly on
> point, it must be close enough to have put the statutory or constitutional
> question beyond debate.   If reasonable people can differ on the
> lawfulness of a government official's actions despite existing case law,
> he did not have fair warning and is entitled to qualified immunity.  This
> court has stated many times that if case law, in factual terms, has not
> staked out a bright line, qualified immunity almost always protects the
> defendant.

Gaines v. Wardynski,  871 F.3d 1203, 1209-10 (11th Cir. 2017) (citations and

punctuation omitted).  "It is particularly difficult to overcome the qualified

immunity defense in the First Amendment context."  Id. at 1210 (citations

omitted).

None of the cases Martin cites in her response are particularized to the facts

of this case or are close enough to have put the constitutional question "beyond

debate."  Pl.'s Br. at 34-35.  Consequently, she has not carried her burden of

showing that the Individual Defendants violated a clearly established constitutional

right.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** as to

Defendants Overstreet, Blitch, and Lensch in their individual capacities.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim [Doc. 37] is **GRANTED IN PART and DENIED IN PART**.  Defendants' Motion is **GRANTED** with respect to Martin's claims against Overstreet, Blitch, and Lensch in their individual capacities, and those Defendants are **DISMISSED**.  Defendants' Motion is otherwise **DENIED**.

**IT IS SO ORDERED** this 21st day of May, 2021.

MARK H. COHEN
United States District Judge

29